**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Louis Joseph Marion Marvin IVES,
Defendant-Appellant.**

**No. 73-1726.**

United States Court of Appeals,
Ninth Circuit.

Aug. 9, 1974.

936

Mark E. Vovos (argued), of Bovey & Vovos, Spokane, Wash., Kelly Hancock (argued), Omak, Wash., for defendant-appellant.

Robert S. Linnell, Asst. U. S. Atty. (argued), Spokane, Wash., for plaintiff-appellee.

* Honorable Albert C. Wollenberg, United States District Judge, San Francisco, California, sitting by designation.

1. The Supreme Court in Illinois v. Allen stated:
No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for

## OPINION

Before DUNIWAY and WALLACE, Circuit Judges, and WOLLENBERG,* District Judge.

WALLACE, Circuit Judge:

Ives was convicted of murder on an Indian Reservation, in violation of 18 U.S.C. §§ 1111 and 1153. He appeals, claiming (1) that his constitutional and statutory rights were infringed when the district judge refused to allow him to testify, (2) that he was incompetent to stand trial and the judge erred in refusing to hear psychiatric evidence on the issue, (3) that the court lacked jurisdiction and (4) that various errors were committed pertaining to psychiatric testimony, jury instructions and jury separation. We affirm.

## I

This case illustrates the recent problem of the obstreperous defendant in our criminal courts. Ives' first ill-fated trial ended in a mistrial because of his continuous disruption. The second trial judge was not oblivious to Ives' track record, having read the transcript of the first trial and personally discussed Ives' disruptions with the judge who presided at the first trial. Forewarned, and in accordance with the constitutionally permissible methods of dealing with a contumacious defendant as enunciated in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), he wisely took appropriate steps [1] to insure Ives' failure in any attempt to cause a second mistrial.[2] As one such precaution he or-

contempt; (3) take him out of the courtroom until he promises to conduct himself properly.
397 U.S. at 343–344, 90 S.Ct. at 1061.

2. Avoiding mistrials was part of the Illinois v. Allen rationale:
[T]he accused [cannot] be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their or-

dered the installation of special sound equipment in the courtroom and in a cell beneath it, so that in the event that it became necessary to remove Ives from the courtroom, he could hear the proceedings. Likewise, he ordered the installation of special telephones, with lights rather than bells, in the cell and on defense's counsel table so that Ives could communicate with his attorneys during the course of the proceedings.[3] Not unexpectedly, the judge was constrained to remove Ives on several occasions to the special cell beneath the courtroom.

The trial judge unquestionably had the power and authority to remove Ives from the courtroom because of his disruptive conduct. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). This case, however, adds a new dimension to the usual disruptive defendant cases and raises a very serious constitutional question. Although Ives insisted that he be allowed to testify in his own behalf, the trial judge, after many instances of disruption in the courtroom, determined that Ives had lost that privilege because of his failure to conduct himself in a manner necessary to maintain the decorum of the court. Thus, Ives was not only excluded from the courtroom, but also was not allowed to return to testify in his defense against the murder charge brought against him.

Our judicial system has not always afforded the accused the opportunity of testifying in his own behalf.[4] Between the sixteenth and nineteenth centuries, the common law did not allow him to do so. Nor does the Constitution grant a specific right to testify.[5] Thus, for a period of time in our history, the privilege to testify was not recognized either under common law or by specific constitutional mandate. The privilege was first recognized in the federal courts in 1878 when Congress specifically directed that defendants shall be deemed competent witnesses.[6]

derly progress thwarted and obstructed by defendants brought before them charged with crimes. . . . [I]f our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the Illinois trial judge in this case.
397 U.S. at 346–347, 90 S.Ct. at 1062.

3. I would add only that when a defendant is excluded from his trial, the court should make reasonable efforts to enable him to communicate with his attorney and, if possible, to keep apprised of the progress of his trial. Once the court has removed the contumacious defendant, it is not weakness to mitigate the disadvantages of his expulsion as far as technologically possible in the circumstances.
397 U.S. at 351, 90 S.Ct. at 1064 (Brennan, J., concurring).

4. Popper, History and Development of the Accused's Right to Testify, 1962 Wash.U.L. Q. 454. See Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961).

5. The only case we have found attempting to enunciate such a specific constitutional right was Poe v. United States, 233 F.Supp. 173, 176 (D.D.C.1964), where the court stated:
An accused in a criminal trial in federal court has the right to testify in his own behalf. This right is guaranteed and protected by the Fifth and Sixth Amendments to the Constitution, and by federal statute, 18 U.S.C. § 3481. The Fifth Amendment, in pertinent part, provides:
"No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law * * *"
The Sixth Amendment, in pertinent part, provides:
"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."
The Circuit Court affirmed without discussing any right to testify derived from the Constitution. 352 F.2d 639 (D.C.Cir.1965). The constitutional pronouncement made by the district court in Poe has generally been ignored by the courts except for a statement by the Fourth Circuit, citing Poe, that "[t]he right to testify has been described as a constitutional right." The court held, however, that in a federal court the right is statutory and subsequently referred to it as a privilege. United States v. Looper, 419 F.2d 1405, 1406–1407 (4th Cir. 1969).

6. 18 U.S.C. § 3481 (originally enacted on March 16, 1878).
In 1864, Maine became the first state to enact a statute allowing a defendant to testify. Within 20 years, most of the states had

If, in addition to this statutory privilege to testify, there is also a constitutional guarantee, that guarantee must be rooted in the due process requirement of the Fifth Amendment.[7] If so, it has lain dormant since the adoption of the Constitution. Because of the statute enacted in 1878, making a defendant a competent witness in a federal case, we have not been required to determine whether the Constitution separately guarantees an accused the privilege of testifying.

Although not identifying it as a constitutional guarantee, most courts in recent years have recognized that a defendant should be allowed to testify in his defense. The courts have not been precise in identifying the source or nature of this interest. Some have referred to it as a privilege[8] while others have termed it a right.[9] We have recently held that the Fifth Amendment protection against self-incrimination in the filing of income tax information is a privilege. Garner v. United States, 501 F.2d 228 (9th Cir. 1974). Because it is a privilege and not a right it must be claimed or it is waived. *Id.* at 240. It is unnecessary for us to decide whether it is a privilege or a right; for convenience, we refer to it as a privilege. It is unnecessary for us to delineate further than to hold that if the Fifth Amendment does guarantee a defendant the opportunity to testify, he must claim it by attempting to take the stand or it is waived. As the Supreme Court has recently stated: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).[10] The privilege of a criminal defendant to testify is the other side of the coin on which appears the privilege against self-incrimination. In the context of a criminal trial, the latter privilege is "claimed" by the defendant's doing nothing; in fact it need not be "claimed" at all. The defendant simply does not testify. If he does not elect to testify, he must be deemed to have waived his priv-

similar provisions and all but Georgia had abolished the disqualification by 1900. Popper, *supra*, note 4, at 463–64.

7. In Ferguson v. Georgia, 365 U.S. 570, 601–603, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961), Justice Clark, in a concurring opinion joined in by Justice Frankfurter, contended that a Georgia statute rendering a criminal defendant incompetent to testify should be held unconstitutional as not meeting the requirements of due process. The majority of the Court held that that issue was not properly before it.

It may be that the Supreme Court will eventually hold that a defendant in a criminal case has a constitutional right or privilege to testify in his own behalf. *See* Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Brooks v. Tennessee, 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972); Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L. Ed.2d 1 (1971); In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948); Snyder v. Massachusetts, 291 U.S. 97, 116, 54 S.Ct. 330, 78 L.Ed. 674 (1934). *See also* United States v. McCord, 137 U.S.App.D.C. 5, 420 F.2d 255, 257 (1969); Yates v. United States, 227 F.2d 844, 846 (9th Cir. 1955), aff'd in part, rev'd in part, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957).

8. Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (dictum); Sims v. Lane, 411 F.2d 661, 664 (7th Cir.), cert. denied, 396 U.S. 943, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969); Yates v. United States, 227 F.2d 844, 846 (9th Cir. 1955), aff'd in part, rev'd in part, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); United States v. Bentvena, 319 F.2d 916, 943 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 346, 353, 354, 355, 360, 11 L.Ed.2d 271, 272 (1963).

9. United States v. McCord, 137 U.S.App.D.C. 5, 420 F.2d 255, 257 (1969) (dictum—"constitutional right"); Poe v. United States, 233 F.Supp. 173, 176 (D.D.C.1964), aff'd, 352 F.2d 639 (D.C.Cir.1965). In United States v. Looper, 419 F.2d 1405, 1406 (4th Cir. 1969), *Poe* was cited as describing the right to testify as a constitutional right. The *Looper* court then went on to use "right" in one paragraph and "privilege" in another.

10. We have referred to it both as a privilege and as a right. Yates v. United States, 227 F.2d 844, 846 (9th Cir. 1955), aff'd in part, rev'd in part, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957).

ilege to do so. It would make no sense and, in the light of Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), it would introduce possible error into the trial to require that the court or the prosecutor ask the defendant whether he wishes to testify. That is the reason why the defendant must claim his privilege to testify or be deemed to have waived it.

Also it is unnecessary for us to determine whether the Fifth Amendment requires that a defendant be allowed to testify. We need go no further than to hold that even if there is such a constitutional requirement, that privilege must be claimed and may be waived. The statute recognizing criminal defendants as competent witnesses creates a privilege to testify that may also be waived. However, in this case we hold that the conduct of Ives was sufficient to waive his opportunity to testify, whether it be rooted in the Constitution or in a statute. In doing so, we are aware that a privilege guaranteed to an individual by the Constitution has a higher status than a similar privilege granted by the Congress—one that Congress can take away as well as grant. In Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court held that where a defendant's constitutional right is infringed during a trial, the usual harmless error rules do not apply. The error must be found harmless beyond a reasonable doubt; otherwise a reversal is required. Moreover, the Court pointed out that it was held "that there are some constitutional rights so basic to a fair trial that their

infraction can never be treated as harmless error." *Id.* at 23, 87 S.Ct. at 828.

■ Similarly, the Court has consistently taken the position that a waiver of a constitutional right or privilege will be measured against a higher standard than a waiver of a right or privilege not guaranteed by the Constitution. As the Court stated in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L. Ed. 1461 (1938): "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' " (Footnotes omitted.)

The denial of a criminal defendant's privilege to testify in his own behalf was the basis for reversing a conviction in United States v. Bentvena, 319 F.2d 916 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 346, 353, 354, 355, 360, 11 L.Ed.2d 271, 272 (1963).] [11] As in the present case, the first jury trial resulted in a mistrial [12] and the second trial judge was aware of the defendant's earlier conduct. Not surprisingly, the second trial was also permeated by the defendant's loud outbursts. One of the defendants hurled a chair, narrowly missing his target (one of the United States attorneys), which shattered on impact with the jury box. Another defendant ascended into the jury box and proceeded to shove several of the jurors while shouting vilifications at them, the judge and other defendants.[13]

One of the *Bentvena* defendants, Salvatore Panico, requested that he be allowed to testify in his own behalf. The

---

11. Although the *Bentvena* court described the defendant's testifying in his own behalf as a privilege, the defendant's conviction was reversed because he was not allowed to testify. In United States v. Looper, 419 F.2d 1405 (4th Cir. 1969), the Fourth Circuit overturned a conviction on the ground that the trial court erred by not allowing a defendant to testify because he refused to take an oath with God's name in it.

12. The mistrial in *Bentvena* was declared after a trial of six months. 319 F.2d at 929.

13. In summarizing the despicable actions of the defendants, the Second Circuit stated: "Suffice it to say that more abhorrent conduct in a federal court and before a federal judge would be difficult to conceive." 319 F.2d at 930. This statement has not withstood the test of time. The *Bentvena* trial of 1963 would be considered only a starting point by some of the more recent disruptive individuals in the criminal courts.

trial judge stated that he had a right to testify and asked him if he would behave himself on the stand. After a brief discussion with the defendant, the court, during a recess, overruled an objection by another defendant that Panico not be allowed to testify. Subsequently, however, the trial judge changed his mind and refused to allow Panico to testify.[14] The Second Circuit reversed Panico's conviction because of this denial, but stated:

> The question appears to be one of first impression, and while we do not wish to indicate that the privilege may never be waived by conduct, the facts in the present case do not warrant that conclusion.

319 F.2d at 944.

■ We are impressed with the reverence shown by our brothers of the Second Circuit for the sanctity of the privilege of the accused to testify. We have stated this privilege is of "inestimable value." Yates v. United States, 227 F.2d 844, 846 (9th Cir. 1955), aff'd in part, rev'd in part, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957). There is no doubt that its protection is fundamental to our judicial process.

The *Bentvena* court referred to the testimonial privilege and implied that the conduct of a defendant may waive it. An analogous situation is presented in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Although basing its decision on Sixth Amendment considerations rather than the requirements of the due process clause, the Court set forth the correct criteria for constitutional balancing. The Court held that a defendant may, by his conduct, waive his right to be present in the courtroom if he "insists on conduct-

ing himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." 397 U.S. at 343, 90 S.Ct. at 1060 (footnote omitted).

■ It is evident that the conduct of a defendant in the courtroom can become so inconsistent with the necessary decorum for effective administration of justice that reasonable restraints are necessary. It is even more evident that such conduct cannot be allowed when the defendant takes center stage on the witness stand. He has no more liberty and freedom to testify in a way degrading to the judicial system than he has to rob a bank or to assault a constable. What the Court said in Illinois v. Allen about disruptive defendants is equally applicable to those who wish to testify:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.

397 U.S. at 343, 90 S.Ct. at 1061.

■■ We hold, therefore, that just as the right of presence in the courtroom can be waived by the defendant's contumacious conduct, the privilege to testify can also be waived by the defendant's conduct. Because we are assuming, but not deciding, that Ives' privilege to testify is constitutionally guaranteed, we believe that the privilege cannot be lost unless it is clearly necessary to

---

14. The trial judge stated:
"I had him up there before me and he wouldn't answer. When I asked him whether he would behave, he kept shouting he is going to tell the truth.
"I hold, under the circumstances, that he has waived his right to take the stand in his own defense. By his failure to cooperate for psychiatric examination and be-

cause of his conduct the risk of prejudicing the other defendants is overwhelming. He has done that time and time again and done so wilfully and deliberately. For those reasons I hold that he voluntarily waived his right to take the witness stand in his own defense."
319 F.2d at 942–943.

assure the orderly conduct of the trial. Under Illinois v. Allen, the determination of what conduct constitutes disruption and what method of control should be adopted was held to be largely within the discretion of the trial judge. 397 U.S. at 343–344, 90 S.Ct. 1057. We adopt the same standard for determining if the defendant has waived the privilege to testify. The trial judge, in his discretion, must decide whether the seriousness of the disruption is sufficient to constitute a waiver of the privilege. We also hold, as did the Court in Illinois v. Allen, that the defendant must be warned of the consequences of his actions before a court can determine that he has waived his privilege to testify.

Since we must judge the evidence from a cold record, the appellate court is not in as good a position as the trial judge to determine the effect a defendant's disruptive conduct may have had on the proceedings. Even though facial expressions, gestures and other nonverbal conduct are often tremendously significant, they cannot be transcribed by the court reporter. Therefore, great deference must be given to the decision of the trial judge.

■ The importance of the privilege to testify places a trial judge in a dilemma when faced with a defendant bent on disrupting his criminal trial to the point of not allowing it to proceed to its end.[15] There is a delicate balance between allowing an accused to defend himself against a criminal charge and maintaining the necessary decorum in our halls of justice. Obviously, the trial judge must approach this weighty decision with great circumspection. He should distinguish between occasional incidents which cause only slight disruption and those calculated to thwart the entire proceedings. Although occasional disruptions may be annoying to the judge and he may feel that they would prejudice the defendant in the eyes of the jury, the judge should consider, among other things, the gravity of the disruptions, the likelihood of continued disruption and the possibility of violence if the defendant takes the stand. In considering the probability of continued disruption and violence, the judge should not be unmindful of misconduct of the defendant in prior court appearances.

■ The Bentvena court held that the conduct in that case did not warrant the conclusion that the defendant had waived his privilege to testify. With the subsequent teachings of Illinois v. Allen, we do not know whether our Second Circuit brothers would be as lenient with such an unruly defendant today. At any rate, we now apply the legal test to the facts of this case to determine whether the trial court erred by refusing to allow Ives to testify.

1. During voir dire of prospective jurors as the judge was about to read the grand jury indictment, Ives rose, interrupted the proceedings and stated that he was not present before the grand jury. The trial judge dismissed the prospective jurors from the courtroom and told Ives he was aware that his first trial had ended in a mistrial because of his disruptive conduct and that the judge who had presided at the previous trial had described to him all of the disruptions.[16] He told Ives further

---

15. In Illinois v. Allen, Justice Brennan stated in his concurring opinion:

To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes.
397 U.S. at 350, 90 S.Ct. at 1064.

16. The government has cited us to over 150 interruptions Ives caused in the first trial.

He was removed from the courtroom 16 times. In one incident, he made lewd gestures in court. In another incident, he assaulted one of his attorneys in the courtroom. More importantly, Ives took the stand twice. The first time, he was cautioned several times to confine his testimony to the issues and was finally removed from the stand after swearing at the judge and counsel. The second time he shouted, verbally abused the court and his counsel and gave nonresponsive answers to questions.

that he would be allowed to speak but only when the court granted him permission to do so and at no other time. The judge further admonished Ives that he would be taken out of the courtroom if he disrupted the proceedings but stated that if he were not disruptive, he could remain.[17]

2. During his opening statement, defense counsel referred to his client as a man who was suffering from a mental illness. Ives responded with an obscenity whereupon the judge, after the jury had left the courtroom, reminded Ives of his previous warning that he would be taken out of the courtroom if he disrupted the proceedings and advised him that he would get an opportunity to talk later. The judge cautioned Ives that the jury might dislike him for cursing in the courtroom. The jury was called back and defense counsel continued his opening statement.

3. On one occasion, Ives refused to be present in the courtroom, insisting that he be allowed to remain in jail. The judge stated that he would not force him to be present, but he did order that Ives be forcibly taken from the jail to the cell underneath the courtroom where he could hear the proceedings and could have access to the special telephone to consult with counsel.

4. During a noon recess, Ives called one of his counsel to the cell beneath the courtroom for consultation. Upon counsel's arrival, Ives struck him in the face.

5. On another occasion when Ives was back in the courtroom, the judge, out of the presence of the jury, asked him if he wanted to testify. Ives replied that he would testify to the fact that the federal officers had violated federal law and that the victim's widow had received substantial insurance money because of her husband's death. Ives further stated that he would not answer the questions of his defense counsel. At this point the judge removed Ives to the cell beneath the courtroom. In conference with the prosecution and defense counsel, the judge stated that Ives would be allowed to testify if he did not disrupt the proceedings. He reminded defense counsel that he had read the transcripts of the prior proceedings and was aware of how Ives had disrupted them.[18] The prosecutor stated that he thought Ives should be allowed to testify and that he would like to see that opportunity extended to him again later in the trial. The judge replied that he would give Ives another chance to testify later.

6. Subsequently, the judge advised counsel that he had decided to give Ives another opportunity to testify. With the jury out of the courtroom, Ives' attorney asked him to take the stand. Ives requested that he be allowed to testify from the chair at counsel's table; the judge denied that request. Ives stated that he would not make any disruption but that he could not take an oath when he was being tried for a crime of which he was not guilty. Ives then charged that the prosecution, the previous trial judge and one of his counsel had been bribed by insurance companies to bring false charges against him. The judge then gave Ives the opportunity to testify without taking an oath and stated that if he desired to sit at counsel's table, he could. The judge asked Ives five times where he wanted to sit to testify and each time Ives evaded the questions and would not answer the judge. Instead, he began complaining about the trial. Upon being asked by the judge if he were refusing to answer the question, Ives responded by protesting that both of his counsel were appointed by the court, that he did not choose them and that there were no minority members on the jury. The judge

---

17. Thus, the trial judge complied with Justice Brennan's direction in Illinois v. Allen:

> Of course, no action against an unruly defendant is permissible except after he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequences of continued misbehavior.

397 U.S. at 350, 90 S.Ct. at 1064 (Brennan, J., concurring).

18. See note 16, *supra*.

continued to ask Ives from which chair he wanted to testify and Ives repeatedly evaded the questions and complained that he was being persecuted by the Catholic and Protestant churches and that he could not take the witness stand to testify about a crime he did not commit. Ives was then removed from the courtroom.

7. At one point when Ives was in the cell beneath the courtroom, he telephoned to counsel that he again desired to be in the courtroom when a certain witness was testifying. Ives was allowed to return and remain on condition that he not disrupt the proceedings. The judge reminded Ives of the admonition that if he disrupted the proceedings once more he would be removed again.[19]

8. Once again Ives was called to the witness stand, this time in the presence of the jury. The jury was dismissed when Ives, sitting at the defense table with his feet on an adjoining chair, began pursuing the same argument about where he was to sit to testify. After the jury had left the courtroom, Ives began arguing with the judge and his counsel. His attorney suggested that Ives either be allowed to take the stand or be removed from the courtroom. Further confrontations between Ives and the judge ensued. Finally, defense counsel assumed that Ives was not going to take the stand and called the next witness.

9. In the morning session the next day, Ives indicated that he did not want to attend the proceedings. Later, as a defense psychiatrist was testifying, Ives called his attorneys demanding to come up to the courtroom. Counsel requested that Ives be brought up but this time the judge denied the request. Ives answered the denial with banging and

shouting from his cell underneath, apparently in protest to his being denied the opportunity to come back into the courtroom. Immediately thereafter, and out of the jury's presence, the judge explained to defense counsel that Ives had stated he did not want to be there that morning and that he was not going to let him come in and out of the courtroom at his own pleasure.

10. At the opening of the next session, the judge again permitted Ives to come into the courtroom and renewed his warning that he would be removed if he disrupted the proceedings. Shortly thereafter, and in the jury's presence, Ives ran toward his attorney and threw a book at him. The judge again had Ives removed from the courtroom.

11. Later the same day, after the judge again permitted him to return to the courtroom, Ives attacked the United States attorneys.

12. Soon after the attack on the United States attorneys, defense counsel again requested that Ives be allowed to testify. The court ruled that Ives was not to be allowed in the courtroom again. The judge explained the reason for his decision:

> I just feel this way about it, Mr. Vovos, that I have had plenty of demonstration now to make a decision. I don't think I have to sit back here and keep my fingers crossed about him, having him up here, and then downstairs, and then back up here again, as to whether or not he wants to testify. Solomon might have been able to determine what he was going to do when he got here, but how far do I have to go? I guess I don't have to at all, but I am willing to go a long way, but I am not going to go overboard and have him back up here and

19. The trial judge gave Ives several chances to remain in the courtroom if he was not disruptive. Ives had been previously removed from the courtroom but was allowed back inside. This was just the beginning of Ives' trips in and out of the courtroom.

Once lost, the right to be present can, of course, be reclaimed as soon as the de-

fendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

Illinois v. Allen, 397 U.S. at 343, 90 S.Ct. at 1061.

have a reoccurrence of what has happened already on two occasions in this trial, and once in the prior trial as to his efforts to attack people in the courtroom. I am not obliged to do that.[20]

13. Defense counsel later renewed his request to allow Ives to testify, this time suggesting that Ives be handcuffed and shackled while testifying in order to prevent any further attack. The judge refused this request, stating that he was not going to allow such a display before the jury.[21] He asserted that Ives had already been given his last chance to behave himself and testify, that he did not behave and that he was not going to let him testify.

14. Ives once again requested to testify. The judge, out of the presence of the jury, accurately described the dilemma before him: If he refused to allow Ives to testify, his counsel would charge that the court erred by denying him that privilege; if he allowed Ives to testify and Ives acted as the judge believed he would, his counsel would charge that the court erred by not granting a mistrial.[22]

20. In fact, the record indicates that the trial judge went to great lengths in his attempts to see that Ives was afforded a fair trial. At some point there is always the one extra straw that breaks the camel's back. After reviewing the record, we think that point might have been reached sooner than the judge decided it was reached in this case. The record shows that the trial judge conducted himself with dignity, patience and decorum.

21. Although binding, gagging and shackling the defendant is permissible under Illinois v. Allen, the Supreme Court felt that it should be used only as a last resort:

Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. 397 U.S. at 344, 90 S.Ct. at 1061, 25 L.Ed.2d 353.

22. THE COURT: He is certainly testing me, isn't he?

MR. HANCOCK: I don't know, your Honor.

THE COURT: Well I certainly think he is, as to what I should do with him. He tested me before, and made statements as to what he was going to do which he didn't do, and I just can't rely on anything he says regarding his conduct in the courtroom, and I just don't feel that I am entitled to rely on what he says at this stage of the proceedings. He had plenty of opportunity to tell me that before, but he elected not to, and now, when we have gone this far, I just don't think that under the circumstances I am going to reverse myself and create the problem, because I wouldn't bring him in here under any circumstances without some restraints, and I think that under the circumstances I shouldn't bring him at all. I couldn't trust him, because if I brought him in without restraints I don't know but what he might jump right into that jury box and attack somebody in there, and of course my duty is to protect those people. If I had him up here and he wanted to attack me, that might be different, but I can't rely on him as far as the other people are concerned.

. . . . .

MR. VOVOS: Well Judge, first of all I am renewing my motion for a mistrial, particularly in light of the Court's last ruling in not allowing Mr. Ives to come to the courtroom. I think the Court's words to me yesterday were, as I understood them, that we will see what develops between yesterday and today. Now Mr. Ives has agreed to take the oath, he has agreed to come here to testify under oath, to be shackled, I don't know what more could happen in the presence of the jury that could be any more disruptive than what has already happened. I don't know what he could possibly do in the condition that he perceives or foresees that he is going to be brought up here, and I think that significantly prejudices the jury, because he does in fact want to testify and wishes to testify, and I can't go into what the jury thinks, but I am sure that they are going to assume that he doesn't want to testify.

THE COURT: Well I considered everything you say.

. . . . .

And I have already ruled on it. I considered everything you are telling me, about his election and all the rest of it, his promise, I just have considered everything, and

. . . . .

I knew this was going to happen, I even knew before it happened that he was going to do that, I was satisfied of that.

MR. VOVOS: And in addition, Judge, his activities in the presence of the jury during the opening statement, and during the examination of Dr. Bratrude so prejudiced the jury that he couldn't receive a fair trial aft-

It was not error for the trial court to refuse to allow Ives to testify in this case.

## II

Ives contends that the issue of his competency to stand trial was before the court and the failure to hold a hearing was reversible error.

Six months after the killing, a hearing as to Ives' mental condition at that time resulted in a determination that he was incompetent and he was referred to the Federal Correction Center at Springfield, Missouri. At a hearing four months later, he was deemed to be legally competent to be tried. Shortly thereafter, his first trial commenced; it resulted in a mistrial and a finding of incompetency to be tried and Ives was returned to Springfield. Approximately six months later, the Springfield psychiatric staff opined that Ives was legally competent to be tried. Two months thereafter, based upon the latest Springfield psychiatric report, the court once more found him competent to stand trial and entered a written order. Three months later, the second trial commenced.

■ The second trial judge did not hold a hearing on Ives' competence to stand trial prior to the second trial.

Rather, he found competency based upon the report of the Springfield psychiatric staff. We are aware of cases from the District of Columbia Circuit which might be construed to question this procedure. In Gunther v. United States, 94 U.S.App.D.C. 243, 215 F.2d 493 (1954), the defendant was found incompetent to stand trial following an 18 U.S.C. § 4244 hearing and was committed to St. Elizabeth's Hospital in Washington, D.C. Approximately eight months later, the hospital certified that Gunther was competent to be tried. The *Gunther* trial court did not hold a hearing to determine competency nor enter an order finding competency. The District of Columbia Circuit reversed, citing what appeared to it to be the legislative intent of section 4244, and held that once a defendant is found incompetent to be tried, competency may be found only by a judicial determination. *Gunther* and its progeny, Conteè v. United States, 94 U.S.App.D.C. 297, 215 F.2d 324 (1954) and Kelley v. United States, 95 U.S.App.D.C. 267, 221 F.2d 822 (1954), have received mixed reactions even in their own circuit[23] and have been questioned[24] and distinguished[25] by other circuits.

The *Gunther* court found that the necessity for a judicial determination was based on the wording of section 4244.[26]

er seeing that. In effect I just renew my motion for a mistrial.

THE COURT: I understand, and of course that is the reverse of what you want me to do by bringing him up here. If we don't bring him up here, then you want a mistrial, and because I did let him come up here earlier at your insistence and he did what he did, then for that you want a mistrial. So it is a rather awkward situation for a judge, isn't it, he is wrong if he let's him up here, and then he is wrong because he won't allow him up here.

23. *See* Hunter v. United States, 116 U.S. App.D.C. 323, 323 F.2d 625, 627 & n. 10 (1963), rehearing en banc denied, 119 U.S. App.D.C. 174, 338 F.2d 283, 284 (1964) (Bazelon, J., dissenting from the refusal to apply *Gunther* in rehearing), cert. denied, 380 U.S. 918, 85 S.Ct. 912, 13 L.Ed.2d 803 (1965).

24. *See, e.g.,* Amador Beltran v. United States, 302 F.2d 48 (1st Cir. 1962).

25. *See, e.g.,* Hereden v. United States, 286 F.2d 526 (10th Cir. 1961) (distinguishing both *Gunther* and *Contee*). We distinguished *Gunther* in Formhals v. United States, 278 F.2d 43, 48 (9th Cir. 1960).

26. 18 U.S.C. § 4244 provides in part:

Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such

However, the court in *Gunther* did not require a "full-scale hearing," only a judicial determination. 215 F.2d at 496. We reject any implication in *Gunther* that some type of judicial hearing is required where a defendant has been committed as incompetent, the committing institution has subsequently concluded he is presently competent and the court has entered a finding of competency based upon that opinion. Indeed, Congress itself has removed the vitality from any different interpretation of *Gunther*.[27]

█ We think the better procedure was followed in this case. After a find-

ing of incompetence, the defendant was subsequently certified competent in a psychiatric report. The trial court, with no contrary evidence before it, properly entered an order, based upon that report, finding the defendant competent to stand trial. If, after such a procedure, counsel for the defense or prosecution believes that the defendant is still incompetent, he should move for another section 4244 examination by showing reasonable cause to believe that the defendant is still incompetent. If reasonable cause is shown, then the section 4244 procedures should begin anew.

belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto.

27. The District of Columbia Code § 24–301(a) specifies a procedure for the commitment of defendants found to be incompetent which is similar to section 4244. Until 1955, the statute was silent as to the procedure for trying the defendant once a psychiatric staff at a hospital had determined that he was competent. In 1955, Congress added a new provision to the D.C.Code, § 24–301(b), which provides that:

Whenever an accused person confined to a hospital for the mentally ill is restored to mental competency in the opinion of the superintendent of said hospital, the superintendent shall certify such fact to the clerk of the court in which the indictment, information, or charge against the accused is pending and such certification shall be sufficient to authorize the court to enter an order thereon adjudicating him to be competent to stand trial or to participate in transfer proceedings, unless the accused or the Government objects, in

which event, the court, after hearing without a jury, shall make a judicial determination of the competency of the accused to stand trial or to participate in transfer proceedings.

It was not until 10 years later that the District of Columbia Circuit, sitting en banc, in Whalem v. United States, 120 U.S.App.D.C. 331, 346 F.2d 812, 815–816, cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), declared that Congress had legislatively overruled *Gunther*.

[Section 24–301(b)] was, of course, the statute Congress adopted for the explicit purpose of altering our holding in *Gunther*.

. . . . .

In enacting the 1955 amendments to § 301 Congress, as we read the statute, *specifically overruled* that much of the *Gunther* and *Contee* cases which held that an accused could not be ordered to trial on the basis of the certification of the accused's competency to stand trial by the superintendent of the mental institution wherein the accused has been examined. To adopt appellant's argument in this case would be to legislate judicially the reinstatement of *Gunther* in the teeth of Congress' clear mandate to the contrary.

(footnotes omitted.)

We have earlier referred to *Gunther* without rejecting any implication of a hearing requirement because it was clearly distinguishable. Formhals v. United States, 278 F.2d 43, 48 (9th Cir. 1960); see note 25, *supra*. *Formhals* was decided in 1960, five years after Congress legislatively overruled *Gunther*, but also five years before the en banc court in *Whalem* declared that *Gunther* had been overruled. To the extent that *Gunther* ever had a peripheral foothold in this circuit as to the necessity for a judicial hearing, we expressly reject that foothold today.

In the instant case, the trial judge ordered Ives competent to stand trial and defense counsel did not object. Had counsel questioned Ives' competence to stand trial, a motion should have been filed pursuant to section 4244 prior to the beginning of the trial. This was not done, nor does Ives assert that it was error to proceed to trial without an initial judicial hearing declaring him competent to stand trial. Instead, in the middle of the trial, Ives' attorneys moved for such a hearing and it was denied. Ives contends that his conviction should be reversed because of the denial of that belated motion.

There is a critical distinction between the first section 4244 motion and successive section 4244 motions. In Meador v. United States, 332 F.2d 935, 937–938 (9th Cir. 1964), we dealt with an initial section 4244 motion:

> The district court in the case now before us thus proceeded on the theory that it is not necessary to call for a psychiatric examination before denying a section 4244 motion if the court determines, on the basis of materials such as those described above, that there is no reasonable cause to believe that the accused is mentally incompetent to stand trial. The statute, however, makes no mention of any such preliminary determination by the court as a basis for deciding whether to call for a psychiatric examination. The "reasonable cause" referred to in section 4244 is that of the movant, not the court. Nor does the statute contemplate a preliminary testing of the movant's reasonable cause as a basis for a possible denial of the motion without first calling for a psychiatric examination.

Meador stands for the proposition that when the first section 4244 motion is made, the trial judge has no discretion to deny it on the basis that the court feels that there is no reasonable cause to

believe that the defendant is incompetent.[28] Thus, in cases where there has never been a section 4244 psychiatric examination, the implications of Meador dictate that it is mandatory for the trial court to grant the motion unless

> the trial judge correctly determines that the motion is frivolous or is not in good faith or does not set forth the grounds relied upon for believing that the accused may be incompetent.

United States v. Irvin, 450 F.2d 968, 970 (9th Cir. 1971).

Meador, however, does not control successive section 4244 motions; our decision in United States v. Cook, 418 F.2d 321, 324 (9th Cir. 1969), does:

> When the issue of competency to stand trial is properly raised, there is no question but that an initial psychiatric examination pursuant to 18 U.S. C. § 4244 is mandatory. The question as to when a second examination under the section is required is a question which depends upon the showing made, and the length of time elapsed from the prior psychiatric examination. Obviously a court would not be required to order a hearing during each week of a trial, absent unusual circumstances. The decision as to whether to require a second examination rests in the sound discretion of the trial court. The trial court's decision will not be upset unless there is abuse of that discretion.

When dealing with successive section 4244 motions and exercising his discretion, the trial judge should look to the grounds asserted in the motion, together with any supporting papers, to see if they constitute reasonable cause to believe that the defendant "may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense." Meador,

---

28. Accord, Krupnick v. United States, 264 F.2d 213, 216 (8th Cir. 1959); Wear v. United States, 94 U.S.App.D.C. 325, 218 F. 2d 24 (1954). Contra United States v.

McEachern, 465 F.2d 833, 838 (5th Cir.), cert. denied, 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972).

332 F.2d at 937 (footnote omitted). Thus, while the trial court cannot judge the reasonableness of the grounds for the first section 4244 motion, absent frivolousness or lack of good faith, we think that he should and must do so in exercising his discretion in granting or denying successive section 4244 motions. Where a defendant has been found in a previous section 4244 psychiatric examination to be competent, or found to be incompetent but subsequently found to be now competent, we believe that a greater showing of reasonable cause is necessary to trigger successive psychiatric examinations than for the initial examination. Similarly, where the grounds for successive motions are exactly the same or very similar to the grounds for previous motions and a significant time has not elapsed which would cause doubt as to the circumstances remaining essentially the same, or no new and independent evidence is offered to show a change of circumstances, we believe the trial judge may exercise his discretion and deny the motion. To reiterate what we said in *Cook,* the determination of when to grant successive examinations "depends upon the showing made, and the length of time elapsed from the prior psychiatric examination." 418 F.2d at 324.

In this case, we not only have a successive section 4244 motion, but one made during the trial. Our question is whether the court abused its discretion in denying that motion. The oral motion and the affidavit in support of the written motion are set out in the margin.[29]

29. The oral and written motions were made on the same day. The proceedings involving the oral motion were as follows:

MR. VOVOS: Judge, at this time I make the motion for an order for a psychiatric examination and testing of Mr. Ives to determine his competency now to stand trial, pursuant to 18 United States Code 4244. I have the provision here, and I am sure the Court—

THE COURT: Well I am familiar with the provision, and the order by Judge Powell committing him for that very purpose was previously entered in this case, and he was committed for that purpose, and the examination at Springfield indicated that he was capable of assisting in his defense, and that is why we are trying the case. And I am not going to make another order concerning another examination at this time.

MR. VOVOS: Well Judge, I would like to point out for the record, however, that the last report which I had, which the United States District Attorney has given me was dated in June of 1972.

This is in November, and I would like to point out to the Court if I could, I know I am not under oath, but I can present testimony as to the activities of Mr. Ives this morning. Now Mr. Hancock and I went to the jail, and he did, as the Court indicated, had to be forcibly dressed. During that time there were accusations on the part of myself conspiring with the government, on behalf of Mr. Hancock conspiring with the government, the man has consist-

ently throughout this trial refused to divulge any facts to Mr. Hancock or myself concerning any defense he would have, he has refused to cooperate with us in any way . . . and I think, Judge, that the provision, 18 U.S.C. 4243 provides that anytime the court has a question as to his competency, that an order should be issued, directing to have a determination made at this time as to whether he is competent. We have no testimony or any inkling that now today, on November 10th, 1972, that this man is capable of aiding in his defense, and understands the charges that are against him. First of all—

[THE COURT:] All right, Mr. Vovos, before you proceed let me advise you of this. At the previous trial his activities, as I read this transcript, are of the same character, disruptive, refusal to cooperate, et cetera, and he was examined on that occasion for that very purpose. Now how many psychiatrists have examined this man?

MR. VOVOS: There have been a number, I think about or eight or nine, I don't know for sure.

THE COURT: All right. Now we could go on ad infinitum with psychiatric examinations, and I don't propose to do that, so your motion for psychiatric examination at this time to determine his competency to continue, as I put it, to assist in his defense is denied.

The affidavit in support of the written motion stated:

MARK E. VOVOS, being first duly sworn, upon oath, deposes and says: That

Having read the transcript of the first trial, the second trial judge was fully aware of the circumstances causing a mistrial in that proceeding. There was testimony in the first trial by both defense and prosecution psychiatrists that there was a very good chance that Ives was malingering. One of the psychiatrists at Springfield wanted to administer the Minnesota Multiphasic Personality Test to determine whether Ives was feigning mental illness. Ives spoiled the test by answering both true and false to each of the 565 questions which led the psychiatrists to conclude that Ives was probably intentionally malingering. Another psychiatrist testified that if Ives desired to do so, he had the capacity to cooperate and assist in his own defense. There was testimony from another psychiatrist that Ives' disruption in the first trial was an act because Ives was a dramatic, fluent, knowledgeable and capable person. That psychiatrist further testified that Ives made a study of many things, particularly mental disorders, and that he was impressed with Ives' knowledge of medical terms, particularly psychiatric terms.

One psychiatrist noted that recently there had been national publicity of sensational trials which had resulted in mistrials or acquittals and no subsequent prosecution and that Ives' disruption could have been influenced by this publicity and that his grandstanding and malingering could have been caused by a belief that a finding of insanity would help him. In a written report, a psychiatrist stated that his initial impression was that Ives was a con artist.

The first trial judge declared a mistrial and found Ives incompetent to stand trial because Ives would not cooperate with his attorneys.[30]

Ives rejected several attorneys who were appointed to represent him. He insisted upon choosing his own attorney, preferably an Indian, although as an indigent Ives could not afford to retain

he is one of the appointed attorneys for Louis Joseph Marion Marvin Ives, and pursuant to a court order entered in this cause; that since Mr. Ives' return to the Spokane County area in September 1972, Mr. Ives has failed to cooperate with me as his appointed attorney and counsel and toward the end of properly aiding me in his defense. That your affiant feels that because of the record in this cause and Mr. Ives' previous activities before this court, that there is substantial question as to his ability and his competency to stand trial and to aid in his own defense. More particularly, your affiant feels that Mr. Ives does not understand the nature of the charge against him and is not capable of aiding and assisting in his own defense. More particularly, your affiant feels that due to the past circumstances as appears from the file herein and the transcript of the previous trial, and in light of the fact that Mr. Ives was last examined by a psychiatrist prior to his return to the Spokane area in the month of June 1972, that there is a substantial and sufficient period of time in which his condition has changed and deteriorated. That your affiant is aware of a medical report to this court dated in June 1972, indicating that Mr. Ives is not [sic] competent. Specifically, your affiant feels that a period of five months since that report is a sufficient

length of time to raise the question again of Mr. Ives' competency to stand trial, to understand the nature of the charges against him and to assist in his defense, particularly in light of his actions and his conduct toward his attorneys. In support of this statement, your affiant represents that on October 30, 1972, he has received a list of witnesses from Mr. Ives of approximately 75 to 100 names of which for the first time Mr. Ives has revealed as witnesses that may help him in his trial. That your affiant feels that if this is the case, then the last two months since your affiant has been in contact with Mr. Ives, he has not appreciated the nature of the charges against him and has significantly been unable to assist in his own defense.

That your affiant feels from his observations of Mr. Ives and his conversations with him that Mr. Ives does not understand the seriousness or the nature of the charges against him and cannot significantly aid in his defense and that a psychiatrist should be appointed for an examination to determine his competency at this time.

30. THE COURT: I am inclined to agree with you, Mr. Linnell and I am inclined to agree that an order should be entered finding Mr. Ives not competent to stand trial, because he does not cooperate with counsel—

counsel. Ives disagreed with, shouted at and even physically assaulted his attorneys whenever they would not do as he wished. On this point, a psychiatrist testified that Ives would not cooperate with any attorneys if he did not like the way the trial was going or "if he didn't like what was coming his way."

Of primary importance in reviewing the denial of the motion is the fact that the grounds for the motion were exactly the same as those which had been considered previously at the time of the mistrial. No new and independent evidence, not already considered for a section 4244 motion, was offered to show why Ives might be incompetent. Any additional facts were merely a rerun of his prior performance.

Furthermore, after Ives' motion was denied, no offer of proof was made as to any psychiatric or other testimony. Therefore, we are left with precious little to determine whether any error was prejudicial. If new testimony of Ives' incompetence could have been produced, counsel should have made an offer of proof. *See* Ashton v. United States, 116 U.S.App.D.C. 367, 324 F.2d 399, 401 (1963).

 From the evidence before us, we conclude that the trial judge acted within his discretion in denying the motion for another mental examination.[31]

That motion was essentially based on Ives' refusal to cooperate with his counsel. If such a claim were automatically allowed to force a recess for a psychiatric examination, any defendant could postpone his trial indefinitely by refusing to talk with his attorneys, or by acting obstinately and disruptively and bringing section 4244 motions. We are not willing to provide the defendant with such an incentive.

We find further support for our holding in United States v. Marshall, 458 F.2d 446 (2d Cir. 1972), and United States v. Taylor, 437 F.2d 371 (4th Cir. 1971). In *Marshall* Guglielmo, one of the defendants, sought a reversal of his conviction on the ground that his own obstreperous conduct in court imposed a duty on the trial judge to initiate further psychiatric examinations to determine if he were competent to stand trial. Prior to the trial, counsel was successful in his section 4244 motion and Guglielmo was committed to the medical center at Springfield, Missouri, for psychiatric examination. The staff reported that Guglielmo was mentally competent to stand trial and that he could cooperate with counsel if he desired to. The report further stated that at trial there was a good possibility that Guglielmo would "attempt to engage in bizarre behavior or to act out his need to appear

---

31. Although we must review the exercise of the trial court's discretion in light of the evidence before him at the time the motion was denied, we are cognizant of later events in the second trial which lend further credence to a finding of a proper exercise of discretion. Dr. O'Gorman testified at the second trial, as he had done in the first, that he thought Ives was acting. Dr. Sakwiai, a psychiatrist on the Springfield staff, testified that Ives was very clever in trying to make the staff believe that he had a mental disorder. Ives constantly complained about his back and asked for a wheelchair; but, when the regular staff was not there in the evening, Ives played basketball very vigorously. Also at Springfield Ives was heard to say that he would do anything that he possibly could in order to keep any proceedings against him from going on because it was well known among prisoners that the longer a case is delayed, the better the chances are

for avoiding any punishment. Ives stated that a man is as crazy as he wants to be. He told one psychiatrist that he wanted to put on a show in court like the *Chicago Seven* case [*see, e. g.,* United States v. Seale, 461 F.2d 345 (7th Cir. 1972) ; In re Dellinger, 461 F.2d 389 (7th Cir. 1972)] to bring attention to Indian rights and told another that he acted up in the first trial because his murder charge was a case of life or death.

While at Springfield, prolixin, a strong tranquilizer, was administered to Ives who responded within an hour by ceasing any verbal abuse and becoming very cooperative. Since about 48 hours are normally necessary for prolixin to take effect, some of the staff concluded that Ives was malingering. To test their theory, instead of prolixin shots, the staff substituted simple salt water for the tranquilizer and Ives continued to react as if he had been receiving prolixin.

psychotic . . . ." 458 F.2d at 448. At a suppression hearing, "Guglielmo accused the Government of 'lying,' and sought to dismiss his assigned counsel because he suspected that the lawyer was a government 'agent.'" *Id.*[32] After viewing the defendant's conduct, the trial judge became unsure of Guglielmo's competency and appointed an independent, private psychiatrist to examine him. The report stated that Guglielmo was competent, that he was malingering a mental illness and that "I anticipate that Mr. Guglielmo is likely to continue to display disruptive behavior in a conscious effort to confound legal process." *Id.* The court found Guglielmo competent, the trial commenced, and Guglielmo fulfilled the prediction:

> Guglielmo created several disruptions during the eight-day trial. There were several outbursts when he directed obscenities and accusations toward the Court, witnesses, and the prosecutor. On one occasion, the Court ordered Guglielmo removed from the courtroom and there was one instance when he chose to absent himself. At one point, he requested that the Court just sentence him and spare him the unfair trial he was receiving. On another occasion, Guglielmo hurled a water pitcher at the prosecutor and later threw a chair toward the jury rail. Finally, during summation by Solina's counsel, Guglielmo cut his wrists with a razor blade and also cut his tongue, purportedly attempted to swallow the blade.

*Id.* (footnotes omitted).

Citing our decision in *Cook* along with other cases, the Second Circuit stated:

> We conclude that the trial court did not abuse its discretion in failing to order the appellant to be examined a third time.
>
> . . . When the second examination confirmed the findings of the first, the trial judge became convinced that Guglielmo was malingering. His observations of Guglielmo throughout

the remainder of the trial did not alter that conclusion. Under these circumstances, we cannot hold that the trial court abused its discretion in failing to regard appellant's disruptive conduct as providing "reasonable cause" to believe he was incompetent.

*Id.* at 450 (footnote omitted).

Similar facts occurred in *Taylor* where the defendant had an extensive history of mental disturbance and violence. Taylor was convicted of armed robbery after the jury rejected an insanity defense. While serving his sentence, Taylor was charged with assaulting another man. Prior to the assault trial, a section 4244 motion was granted. A psychiatric report stated that Taylor was competent and the trial commenced, only to result in a mistrial after Taylor became unduly boisterous and obstreperous and attacked a witness with a chair. Subsequently, there was a finding of competency and at the next trial, a section 4244 motion, reciting essentially the same facts as the previous section 4244 motion, was denied and on appeal the Fourth Circuit stated:

> There was no need for a subsequent examination of the defendant's competence to stand trial. The second motion recited essentially the same facts as its predecessor; only a contention that the first examination was deficient was added. Where an examination has been conducted so recently as to furnish a basis for a determination of present competence, there is ordinarily no reason to order another. Hall v. United States, 4 Cir., 410 F.2d 653. This is particularly true where, as here, the motion for a second examination fails to allege any facts, observed since the first examination, indicating possible incompetence, and the first motion had itself provided little or no factual basis for questioning the defendant's competence. Nor was the outburst which terminated the first trial of such significance to this question as to require

---

32. Ives made the same accusations in his trial.

further psychiatric investigation of the question of competence. The whole picture remained one of unimpaired understanding and capacity to cooperate with his lawyer. No such impairment is claimed to have manifested itself in any way during the second trial. Accordingly, we find no error in the determination that Taylor was competent to be brought to trial for the second time.[33]

Similarly, we find no error here.

## III

Ives challenges the federal court's jurisdiction because the government did not prove that he was an Indian, or that the alleged offense occurred in Indian country. Although Ives had requested that his name be removed from the rolls of the Colville Tribe in 1969, it was not done. But, enrollment or lack of enrollment is not determinative of Ives' status as an Indian. Ex parte Pero, 99 F.2d 28, 31 (7th Cir. 1938), cert. denied, 306 U.S. 643, 59 S. Ct. 581, 83 L.Ed. 1043 (1939). The record contains substantial evidence sufficient to support a jury finding that Ives was an Indian.

Ives' second jurisdictional attack must also fail. From the testimony of the Yakima Agency Realty Officer, the owner of the premises where the shooting occurred, and various other witnesses, the jury could properly find that the offense took place in Indian country. United States v. Jewett, 438 F.2d 495, 497 (8th Cir.), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 117 (1971); Gourneau v. United States, 390 F.2d 320, 321–322 (8th Cir. 1968).

## IV

In the government's case-in-chief, a psychiatrist testified on the issue of defendant's sanity at the time of the crime. Ives asserts that it was error for the court to allow additional psychiatric testimony in rebuttal to the defendant's psychiatric testimony. "The order of proof at trial is a matter within the sound discretion of the trial court and will not be overturned in the absence of prejudicial error . . . . ." United States v. Martinez-Villanueva, 463 F.2d 1336, 1337 (9th Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 236, 34 L. Ed.2d 177 (1972). The trial judge did not abuse his discretion in this instance and the admission of the rebuttal evidence was not a prejudicial error. See United States v. Vivero, 413 F.2d 971 (2d Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970).

Other alleged errors that Ives complains of regarding psychiatric testimony are without merit. Ives alleges that a psychiatrist called by the prosecution violated 18 U.S.C. § 4244 by testifying on the "issue of guilt." However, Ives fails to substantiate his claim by citation to the record. Upon examining the record, we are not convinced that 18 U. S.C. § 4244 was violated.

We reject Ives' contention that the psychiatrist who examined Ives on behalf of the prosecution should have given Ives the *Miranda* warnings. The psychiatrist's interviews with Ives were not to gain evidence of guilt or innocence of the charge, but rather for the purpose of determining his mental capacity. It would have been totally inap-

33. The court stated in a footnote:
Motions made under 18 U.S.C. § 4244 for examination should not be granted so routinely that the statute amounts to no more than a provision for an automatic continuance on the defendant's request. Ordering an examination is not a perfunctory or ministerial act. It calls for the exercise of judicial discretion to determine whether there is "reasonable cause to believe" that the defendant may not be competent to be tried. The motion is re-

quired to state the ground for the belief. While we agree that doubts should be resolved in favor of ordering an examination, we find no doubts in this case where neither the defendant's appearance nor his history as recited in the motion provided any reason to question whether he possessed a rational and factual understanding of the proceedings or could assist his attorney to the extent any untrained defendant could assist, in preparing a case. 437 F.2d at 376 & n. 7.

propriate for the psychiatrist to have given *Miranda* warnings before he began the interview.

Ives also contends that his conviction should be reversed because of the giving of, or failing to give, certain jury instructions. We have carefully reviewed these instructions and find no error.

■ In reviewing the trial judge's determination to allow the jury to separate during trial, we can reverse and grant a new trial only if there was an abuse of discretion. Frame v. United States, 444 F.2d 71, 72 (9th Cir.), cert. denied, 404 U.S. 942, 92 S.Ct. 291, 30 L. Ed.2d 256 (1971). The trial judge properly explained the jury's responsibilities and specifically admonished them to avoid coverage of the case by the media. There was no abuse of discretion.

Affirmed.

Godbold, Circuit Judge, filed a dissenting opinion.