Luther TYARS, Petitioner,

v.

Dr. Richard FINNER, Medical Director of Patton State Hospital, Patton, California, Respondent.

No. CV 79–02008–AAH(G).

United States District Court, C. D. California.

May 21, 1981.

Littleton M. Gunn and Andrew E. Rubin, Deputy Public Defenders, San Bernardino, Cal., for petitioner.

Jay M. Bloom, Deputy Atty. Gen., San Diego, Cal., for respondent.

ORDER ADOPTING REPORT AND REC-OMMENDATION OF UNITED STATES MAGISTRATE ON PETI-TION FOR WRIT OF HABEAS COR-PUS

HAUK, Chief Judge.

This Court has reviewed the Petition, the file, and the Report and Recommendation of the United States Magistrate who has reviewed the petition. The Court has also reviewed the Objections filed by both the respondent and the petitioner, and the Magistrate's Final Report and Recommendation upon such objections. The Court approves and adopts the original Report, including the recommended findings of fact and conclusions of law, as the opinion of the Court.

IT IS ORDERED that the Petition for Writ of Habeas Corpus is denied.

REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

This Report and Recommendation is submitted pursuant to the provisions of 28

U.S.C. § 636(b)(1)(B) and General Order No. 194 of the United States District Court for the Central District of California.

On April 12, 1976, the San Bernardino County District Attorney filed a petition under California Welfare and Institutions Code §§ 6500–6512 for the commitment of petitioner Luther Tyars as a mentally retarded person who was a danger to himself and others. The San Bernardino County Superior Court appointed the county public defender to represent Tyars and set May 5, 1976 for a jury trial. After five continuances, on September 14, 1976 the court ordered the proceedings off calendar based on the California Supreme Court's stay of the matter. The California Supreme Court vacated its stay order on October 15, 1976.

Preliminary motions were argued on February 1, 1977 and the Deputy Public Defender asked that Tyars' Fifth Amendment right against self-incrimination be respected and that Tyars be advised that any statement made by him could be used against him. The court denied the motion.

At the trial on February 2, 1977, the state called a staff psychologist and a staff psychiatrist from Patton State Hospital where Tyars was currently confined. Each of the doctors had interviewed Tyars and testified that his I.Q. ranged from 35–62 and that he had exhibited anger and hostility during the interviews. The state then called Tyars pursuant to Cal.Ev.Code § 776 (allowing cross-examination of an adverse witness out of sequence) over continuing objection of Tyars' counsel.

The court found that Tyars was incapable of understanding the customary oath, but that he did understand the importance of telling the truth. Tyars promised the judge that he would tell the truth. Because of Tyars' severe speech handicap, the court caused Lawrence Meteer (a Patton State Hospital technician who was later the state's chief eyewitness in establishing Tyars' violent episodes) to be sworn as an "interpreter" to translate "English into English." The "interpreter" did not restate the court's questions to Tyars, and on occasion, answered the court's question without even purporting to answer on Tyars' behalf. Certain of Tyars' words which were understandable (at least to the court reporter) were not the same as interpreted by Mr. Meteer (Rptr's transcript, pp. 91, 92, 93, 96). At one point, a spectator in the courtroom purported to "translate" one of Tyars' answers (Rptr's transcript, p. 91). Tyars described several of his acts of violence, punctuating his testimony with loud "pows" and attempted punching motions. Throughout his testimony, Tyars was bound in restraints.

The jury deliberated 45 minutes and on February 3, 1977 returned its verdict that Tyars was a mentally retarded person who is a danger to himself and others, and the court ordered Tyars' involuntary commitment to Patton State Hospital.

On February 7, 1977, the deputy public defender filed an appeal alleging, *inter alia*, that the lower court's violation of Tyars' Fifth Amendment right against compelled self-incrimination demanded a reversal of the verdict. The Fourth District Court of Appeal of California held that the purpose of the Fifth Amendment was to constitutionally compel governments to establish guilt by evidence independently so that governments may not by coercion prove a charge against an accused out of his own mouth [*Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964)]. The court also found that the availability of the Fifth Amendment privilege does not turn upon the type of proceeding, but upon the nature of the admission and the exposure which it invites [*In re Gault*, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1966)].

The Appellate Court acknowledged that the state's interests in protecting the mentally disabled from himself, and protecting society from the mentally disabled, were legitimate, but reasoned that the individual's interests are no less fundamental than those in criminal proceedings and his liberty is "no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction," citing *In re Gary W.*, 5 Cal.3d 296, 307, 96 Cal.Rptr. 1,

486 P.2d 1201 (1971). The opinion rendered on September 16, 1977 reversed the jury verdict on the basis that the lower court's failure to honor appellant Tyars' constitutional right not to be compelled to incriminate himself was fatal error.

On March 9, 1978, the state Supreme Court granted a hearing. In its opinion rendered January 12, 1979, the California Supreme Court's controlling rationale was that a mentally retarded person in a civil proceeding for involuntary commitment does have available the privilege afforded under the Fifth Amendment but that the privilege in such proceedings was limited to testimony which would tend to incriminate the subject of such proceedings in *criminal activity*. The subject of involuntary commitment proceedings, therefore, could not refuse to testify altogether in the essentially civil proceeding. The Court found that while the lower court's requirement that Tyars respond to questions regarding his assaultive behavior was error, it was harmless error, and affirmed the jury verdict. *Cramer v. Tyars*, 23 Cal.3d 131, 151 Cal. Rptr. 653, 588 P.2d 793 (1979).

In his Petition for Writ of Habeas Corpus, petitioner Tyars again attacks his 1977 commitment on the ground that he was denied the right to exercise his Fifth Amendment privilege against self-incrimination. By concurrently filed affidavit and application Public Defender Littleton M. Gunn requested that he be appointed as Guardian ad Litem, or, alternatively, that a ruling be made that no Guardian ad Litem is necessary to determine the federal question raised by the petition. By Order of May 31, 1979, Judge Stephens ruled that no guardian need be appointed.

The Magistrate directed that the Attorney General file a Return to the petition accompanied by all state records, and that respondent serve a copy of same upon petitioner, and allowed petitioner 20 days after the filing of the state's Return within which to file a Traverse. Respondent's Return and petitioner's Traverse were filed thereafter.

The Magistrate subsequently ordered further briefing from the respective parties on the issues of:

(1) The effect of the 1977 proceedings upon the subsequent yearly proceedings to recommit petitioner Tyars; and

(2) The collateral consequences now in existence for petitioner as a result of the 1977 commitment.

Both parties complied.

## THE ISSUE OF MOOTNESS

Respondent Patton State Hospital concedes exhaustion, but contends that the legal issues raised by petitioner need not be considered since the 1977 commitment expired in 1978. Respondent argues that since petitioner is not presently in custody because of the 1977 commitment the question of whether that proceeding was constitutionally defective is moot.

Petitioner argues (Traverse) that his petition is not moot because this case presents questions of substantial importance which are likely to recur and are effectively impossible to reach during initial commitment stages. In order for petitioner to have been eligible for this Court to entertain his writ he properly should have exhausted all of his state remedies. State exhaustion of remedies would necessarily take a substantial amount of time (Traverse, p. 3).

Further, petitioner points out that he is still subject to the constitutionally infirm rule of *Cramer v. Tyars*, 23 Cal.3d 131, 151 Cal.Rptr. 653, 588 P.2d 793 (1979) and subject to being forced to incriminate himself over and over again at any future hearings by the State of California (Traverse, p. 3).

Petitioner contends that sound judicial administration demands that this Court entertain his petition on its merits (Traverse, p. 3) relying on *In re Curry*, 470 F.2d 368 (D.C. Cir. 1972), *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972) and *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) for that proposition, and, in addition, asserts that where claimed constitutional violations are capable of repeti-

tion, yet evade review, they are not moot (Traverse, p. 4) citing *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1974) and *Carroll v. Princess Anne*, 393 U.S. 197, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Further, petitioner correctly relies on *Friend v. United States*, 388 F.2d 579 (D.C. Cir. 1967) (Traverse, p. 3) since the *Friend* court found that although appellant Friend had been released prior to its consideration of the matter, that case was not moot since the commitment order was one of brief duration, capable of future repetition at its expiration.

Petitioner's court-ordered Supplemental Memoranda argues that he is affected by his 1977 commitment proceeding at each annual return to court since his status as determined at the 1977 proceeding, as well as the evidence adduced at that proceeding, comes under the scrutiny of his trier of fact. In support, petitioner attached an affidavit of his present counsel indicating that the 1977 label of dangerous was used as part of the evidence in the 1979 hearing, and that counsel believes the judge was aware of and considered the published opinion of *Cramer v. Tyars, supra.*

Further, petitioner argues, should this Court grant his petition, proper placement of him might be with the California Regional Center Program, but that the Center might be wary of accepting a mentally retarded person labeled "dangerous." Should the 1977 proceeding be found constitutionally defective petitioner argues that he might be able to gain admittance at that residential center. Petitioner asserts that only a possibility need be raised of collateral consequences in order to prevent a finding of mootness.

█ Petitioner's arguments as well as his authority strongly support his contention that his petition should not be dismissed as moot.

There is no doubt that this Court's decision in the instant matter could affect a large number of people in the State of California who are subject to state involuntary commitment proceedings. If the rule of *Cramer v. Tyars* is constitutionally defec-

tive, the state will continue to compel subjects of state involuntary commitment proceedings to incriminate themselves because the label of the proceeding is "civil" instead of "criminal." The legal community is giving closer and closer scrutiny to state involuntary commitment procedures. See: *Developments in the Law: Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190 (1974). It seems unrealistic to assume that other subjects of such proceedings will not come to federal court for relief from allegedly unconstitutional state commitment proceedings. Sound judicial administration would, therefore, dictate that this challenge should be entertained on its merits. (*In re Curry, supra; Sosna v. Iowa, supra.*)

In addition, the state court's commitment orders are of brief duration (one year) and capable of future repetition (each year). Although the situation in *Friend v. United States, supra*, involved an appeal rather than a habeas corpus petition, petitioner Tyars' commitment is based on precisely the type of order of brief duration which was held by the *Friend* court worthy of consideration on its merits. The key seems to be the fact that the order is capable of future repetition, not the vehicle used for attacking the commitment. Petitioner Tyars has been subjected to repetition of the 1977 commitment proceeding each year, and to an annual order of commitment.

In a recent challenge to the constitutionality of several portions of California's Lanterman-Petris-Short Act this Court held that the matter was not moot despite plaintiff "John Doe's" previous release. *Doe v. Gallinot*, 486 F.Supp. 983 (C.D.Cal.1979). Judge Ferguson's opinion found that although "Doe" had been released from Camarillo State Hospital there was a likelihood of his future commitment and it would be impossible for "Doe" to challenge the action in court before his release. The *Doe* court held that the commitment order was one which is capable of repetition and yet evading review, and that the matter was, therefore, not moot.

The issue of mootness before this court is the same issue as was before this court in

*Doe.* Only the method of attacking the commitment proceeding differs: in *Doe*, it was an appeal.

There is a definite likelihood that petitioner Tyars will be subjected to future recommitment. More than the requisite "possibility" of collateral legal consequences is presented by petitioner Tyars' circumstances (*Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)). Each year since 1977, the state has sought and obtained petitioner's commitment to Patton State Hospital as a mentally retarded person who is a danger to himself and others.

It also seems impossible for petitioner Tyars to effectively challenge one annual commitment in a court within one year's time, since a legal challenge in California would be futile (*Cramer v. Tyars*). As a result, petitioner's commitment order is, just as was Appellant Doe's, an issue which is capable of repetition yet evading review, consequently, not moot. (*Doe v. Gallinot, supra*; and, see: *Coll v. Hyland*, 411 F.Supp. 905 (D.N.J.1976)).

## IS THE FIFTH AMENDMENT PRIVILEGE AVAILABLE TO THE SUBJECT OF A STATE INVOLUNTARY COMMITMENT PROCEEDING?

In *Lessard v. Schmidt*, 349 F.Supp. 1078, 1084 (E.D.Wis.1972) (3-judge court) the court, dealing with commitment for mental illness, defined the framework for examination of the issue here:

"The power of the state to deprive a person of the fundamental liberty to go unimpeded about his or her affairs must rest on a consideration that society has a compelling interest in such deprivation. In criminal cases, this authority is derived from the police power, granted because of the necessity of protecting society from antisocial actions. This power is tempered with stringent procedural safeguards designed to protect the rights of one accused of crime, to assure that no one will be arrested except upon probable cause nor convicted of a crime except in conformity with these procedural rules. In civil commitment proceedings the same fundamental liberties are at stake. State commitment procedures have not, however, traditionally assured the due process safeguards against unjustified deprivation of liberty that are accorded those accused of crime. This has been justified on the premise that the state is acting in the role of *parens patriae* and thus depriving an individual of liberty not to punish him but to treat him. Additionally, it is said that the individual may be deprived of liberty under the police power because of society's need to protect itself against the potentially dangerous acts of persons who, because of mental illness, are likely to act irrationally." (*Lessard*, p. 1084.)

The court held that a person whose civil commitment as a mentally ill person was sought was entitled to counsel. *Id.*, at 1097.

Petitioner Tyars, citing no authority, maintains that he is guaranteed by the Federal Constitution that he will not be forced to incriminate himself before his trier of fact if the ultimate result may be incarceration.

Relying on the language of the Fifth Amendment that no person shall be compelled to incriminate himself in a "criminal case" (United States Constitution, Amend. V) and the rationale of *Cramer v. Tyars, supra*, respondent argues that the protection of the Fifth Amendment is available only to the subject of a criminal prosecution (Return, p. 11). Respondent asserts that it is "well settled" that the privilege only applies where a witness' answers will subject him to criminal prosecution and that the purpose of the Fifth Amendment is maintenance of an accusatorial, rather than inquisitorial, criminal justice system.

While it is true that one purpose of the Fifth Amendment has been defined by the Supreme Court as maintenance of an accusatorial criminal justice system [*Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)], the Supreme Court does not agree that this is the *sole* purpose of the Fifth Amendment:

"The roots of the privilege are, however, far deeper. They tap the basic stream of religious and political principle because the privilege reflects the limits of the individual's attornment to the state and—in a philosophical sense—insists upon the equality of the individual and the state.... One of its purposes is to prevent the state, whether by force or by psychological domination, from overcoming the mind and will of the person ... and depriving him of the freedom to decide whether to assist the state in securing his conviction." [*In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966).]

*Gault* involved an appeal to the Supreme Court by the parents of 15-year old Gerald Gault who had been convicted under adjudicatory proceedings prescribed by Arizona's Juvenile Code. The Gaults argued that the statute was invalid since it violated, *inter alia*, the constitutional guarantee of the Fifth Amendment against compelled self-incrimination.

The *Gault* Court found that although juvenile proceedings were historically labeled "civil" instead of "criminal", the ultimate result might be incarceration and therefore neither the label placed on the proceeding nor the title of the receiving institution were of constitutional consequence.

The Court recognized that the literal wording of the Fifth Amendment refers to *criminal* cases, but reasoned that:

"Against the application to juveniles of the right to silence, it is argued that juvenile proceedings are 'civil' and not 'criminal,' and therefore the privilege should not apply. It is true that the statement of the privilege in the Fifth Amendment, ... is that no person 'shall be compelled in any *criminal case* to be a witness against himself.' However, it is also clear that the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory."

"It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'criminal' involvement. In the first place, juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings.... For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom." (*Gault*, pp. 49–50, 87 S.Ct. pp. 1455–1456.) (Emphasis, the Court's.)

Mr. Justice Harlan's concurring opinion relied on *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934) for the proposition that, "Among the first premises of our constitutional system is to conduct any proceeding in which an individual may be deprived of liberty or property in a fashion consistent with the 'traditions and conscience of our people.' " (*Gault*, at p. 67, 87 S.Ct. at p. 1464.)

The Supreme Court's concern about constitutional safeguards at supposedly "civil" hearings has not diminished since *Gault* was rendered nearly 15 years ago. In the recent case of *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), although holding that the standard of proof at civil commitment hearings was "clear and convincing" (instead of "beyond a reasonable doubt"), the Court reiterated that it has "repeatedly recognized that civil commit-

ment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (*Id.* at p. 425, 99 S.Ct. at 1809.) Although the issue before this Court is whether the Fifth Amendment privilege against compelled self-incrimination applies to adult civil commitment proceedings (an issue distinct from the due process safeguards described in *Addington,* or the panoply of constitutional safeguards to be afforded juveniles mandated by *Gault*), the prevailing view seems to be that despite the differences between juveniles and adults (and the respective adjudicatory proceedings ending in each's incarceration) in the area of individual constitutional protections (particularly the Fifth Amendment protection against compelled self-incrimination), judicial reasoning should be the same. See: McCormick, *Evidence* § 121, p. 259 (McCleary Ed., 1972). The Supreme Court itself agrees. *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), especially the concurring opinion of Burger, C. J. at p. 580.

There has been at least one Fifth Amendment self-incrimination challenge adjudicated by the Ninth Circuit Court. In *Suzuki v. Yuen,* 617 F.2d 173 (9th Cir. 1980) the issue before the court was whether or not the subject of a state civil commitment hearing was institutionalized if he refused a psychiatric interview, relying on the Fifth Amendment. The court upheld the constitutionality of the statute, holding that it did not use the silence of a subject against him; on the contrary, if he remained silent, he could be temporarily committed only if there were "sufficient evidence to believe that the allegations of the petition are true." *Id.,* at 177.

The issue presently before this Court goes beyond that presented to the Ninth Circuit in *Suzuki. Suzuki* specifically recognized a difference between the issue there and the issue at bar. Judge Schroeder's concurring opinion emphasized that *Suzuki* was confined to the specific set of facts before the court, i. e., both the possibility of temporary commitment in the face of silence, and enforced psychiatric examination during such commitment. *Inter alia,* he read the statute as prohibiting use in any subsequent criminal prosecution of any information divulged in the course of a compelled psychiatric examination during temporary confinement. Discussing, among other cases, the California Supreme Court ruling regarding the instant petitioner, *Cramer v. Tyars,* 23 Cal.3d 131, 96 Cal.Rptr. 1, 486 P.2d 1201 (1979), Judge Schroeder commented that: "Such issues are also, in my view, beyond the scope of the case before us." (*Suzuki,* at p. 180.) The majority opinion set out counsel's argument that: "It is only where the state does not have under its own standards sufficient evidence to justify commitment and where it tries to obtain that evidence through incarceration in a coercive alien environment that it is unconstitutional," and stated, "We agree." (*Suzuki,* p. 175, n. 5.) The opinion therefore, does not reach the question before this Court, the applicability of Fifth Amendment safeguards against compelled self-incrimination at state civil commitment proceedings.

 It is axiomatic that issues presented through a federal habeas corpus petition must be determined in the light of federal constitutional standards. *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). Federal courts have consistently determined that *Gault* teaches protection against compelled self-incrimination extends to any proceeding, whether labeled "civil" or "criminal", which could result in the deprivation of an individual's liberty. *Warren v. Harvey,* 472 F.Supp. 1061 (D.Conn.1979); *Ruffler v. Phelps Memorial Hospital,* 453 F.Supp. 1062 (S.D.N.Y.1978); *Kanteles v. Wheelock,* 439 F.Supp. 505 (D.N.H.1977); *Heryford v. Parker,* 396 F.2d 393 (10th Cir. 1968); and *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wisc.1972) vacated and remanded on other grounds at 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); [on remand, 379 F.Supp. 1376 (E.D. Wis.1974); vacated and remanded at 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445

(1975); reinstated at 413 F.Supp. 1318 (1976)]. [*Lessard* was remanded twice by the United States Supreme Court for defects other than its self-incrimination rationale, which was based heavily on *Gault*.]

It would therefore be consistent with current federal constitutional standards to apply the Fifth Amendment safeguard against self-incrimination to petitioner Tyars' situation. As Chief Justice Bird correctly pointed out in her dissent to the majority opinion of *Cramer v. Tyars, supra*, *Gault* determined that the applicability of the Fifth Amendment guarantee against self-incrimination turns not upon the label of the proceeding, but upon the *nature of the admissions and the exposure which they invite*. (*Gault*, at p. 49, 87 S.Ct. at 1455.) Describing a proceeding as "civil" rather than "criminal" is merely to apply a label of convenience (*Gault*, p. 49, 87 S.Ct. at 1455) and not determinative of the Fifth Amendment safeguards which should be afforded subjects of *any* adjudicatory proceeding. If the result might be incarceration against one's will, the privilege applies. (Cf. *Gault*, p. 50, 87 S.Ct. at 1455–1456, so holding in the context of a juvenile delinquent commitment.)

In his concurring opinion in *McNeil v. Director, Patuxent Institution, supra*, 407 U.S. at 257, 92 S.Ct. at 2091, Justice Douglas declared that the Fifth Amendment privilege did apply in civil mental illness commitment proceedings, relying on *Gault*. The majority opinion found it unnecessary to reach the question. *Id.*, at 250, 92 S.Ct. at 2087.

In the instant matter, the nature of the verbal and nonverbal statements made by Tyars in the presence of the jury at his commitment proceeding were clearly both supportive of the state's petition to commit him and incriminating. In response to questioning by the Government counsel, Tyars not only recounted several acts of violence he stated he had engaged in but indicated through his loud "pows" and punching motions that he was neither ashamed of nor repentent for his past behavior.

It is settled law that the Fifth Amendment is applicable to the states through the Fourteenth Amendment, and that the standard in state courts must be consistent with federal constitutional standards. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Citing selective (and incomplete) portions of *Gault* dicta, the *Cramer* court suggested that *Gault* limited application of the Fifth Amendment privilege to questions relating to possible criminal conduct. *Cramer, supra*, 23 Cal.3d at 138, 151 Cal.Rptr. 653, 588 P.2d 793. That conclusion is not correct.

The constitutional error committed in the lower court was not, as the California Supreme Court concluded, merely that portions of the testimony elicited from Tyars could have exposed him to criminal prosecution. The compulsion of the testimony in its entirety was contrary to the guarantees of the Fifth Amendment.

The California Supreme Court held that petitioner could be "required to respond to nonincriminatory questioning which may have revealed his mental condition to the jury, whose duty it was to determine whether he was mentally retarded." *Cramer*, at 139, 151 Cal.Rptr. 653, 588 P.2d 793. It analogized the receipt of such evidence to the permissible disclosure of physical as opposed to testimonial evidence. The enforced testimony of petitioner, it held, was not communications or testimony in the sense of disclosing knowledge. *Id.*

That rationale cannot withstand close scrutiny. In fact, as the California Court itself said (*id.*), such evidence "may in fact be the most reliable proof and probative indicator of the person's present mental condition." *That is why it cannot be compelled.*

In *Walker v. Butterworth*, 599 F.2d 1074, 1082 (1st Cir. 1979), the Court said,

"The critical question, for the purposes of the self-incrimination clause, is whether the forced utterances had communicative content.... The concept of verbal communication ... is not limited to narration or direct confessions of guilt.

Rather, verbal communication is the use of words to impart or transmit information."

In *Walker* a criminal defendant, pleading the defense of insanity, was required to *personally* accept or challenge prospective jurors. "Taken in isolation, the words 'I am content with this juror' mean little. But, in the context of an insanity defense, the words necessarily take on an additional meaning and relate important and incriminating information. The content of the words and the mental processes that they necessarily embodied and revealed, conveyed an inescapable message to the jury. The message conveyed was directly relevant to the sole issue at trial and can be fairly defined as communication for the purposes of the privilege against self-incrimination." *Id.*, at 1082–3.

Here, as in *Walker*, the compelled testimony was directly relevant to a material issue, retardation. Instead of shouldering the entire load, proving its case by its own independent labors, California violated petitioner's right to remain silent. Cf. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

### WAS THE FIFTH AMENDMENT VIOLATION HARMLESS ERROR?

■ Before a federal constitutional error can be held harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 725 (1967).

The state presented competent and impressive evidence aside from petitioner Tyars' testimony. The testimony of Drs. Scherer (a clinical psychologist) and Chapman (a psychiatrist) established that Tyars' I.Q. ranged from a low of 32 to a high of 65. Each also testified that for the period of time each observed Tyars, the petitioner seemed hostile and angry. In addition, Lawrence Meteer (the Patton State Hospital technician who had served as Tyars' "interpreter") recounted several violent episodes he had observed (and, in part, experienced) wherein Tyars had attacked patients and hospital personnel with his fists, cue balls, and chairs. His explicit and unambiguous testimony, based on daily personal contact with petitioner, conclusively demonstrated that petitioner was subject to frequent rages of violence.

■ It can therefore be said that Luther Tyars' unconstitutionally-compelled testimony was harmless beyond a reasonable doubt. The questions before the jury were, first, whether he was mentally retarded, and, second, whether Tyars was a danger to himself or others. After having heard the testimony of Drs. Scherer and Chapman, a juror could not still have entertained a reasonable doubt that Tyars was severely retarded. After having heard the additional testimony of Mr. Meteer, it could not have had any doubt that he was a severe danger to others.

### RECOMMENDATION

IT IS RECOMMENDED that the petition be denied. Despite the violation of petitioner's Fifth Amendment rights against compulsory self-incrimination, he is not entitled to release.

DATED: April 22, 1981.

### FINAL REPORT AND RECOMMENDATION

Having considered the respondent's Objections to the legal conclusions and analysis of the filed Report in this matter, I adhere to the Report and Recommendation filed. The subject matter of the Objections is extensively dealt with in that Report.

Contrary to the argument put forth in the Objections, *Schmerber v. California*, 384 U.S. 757, 764–5, 86 S.Ct. 1826, 1832–33, 16 L.Ed.2d 908 (1966) does not, in my opinion, support the respondent's claim that compelling Tyars to take the stand and answer questions regarding his knowledge, intellect and conduct was not barred by the self-incrimination clause. Expressly declining to be understood as agreeing to the manners in which state and federal courts had purported to distinguish between the prohibited compulsion of "communications" or "testimony" on the one hand, and that allowable compulsion which makes a suspect or

accused the source of "real or physical evidence," the Court said:

"Although we agree that this distinction is a helpful framework for analysis, we are not to be understood to agree with past applications in all instances. There will be many cases in which such a distinction is not readily drawn. Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege 'is as broad as the mischief against which it seeks to guard,' *Counselman v. Hitchcock*, 142 U.S. 547, 562 [12 S.Ct. 195, 198, 35 L.Ed. 110]."

Accordingly, although it upheld the use as evidence of an analysis of a forcibly-withdrawn blood sample, it did so only with a finding that "Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated, indeed, his participation, except as a donor, was irrelevant to the results of the test. . . ." *Id.* at 765, 86 S.Ct. at 1832–33. In a footnote the Court expressly declined to be understood as adopting the Wigmore [8 Wigmore, Evidence § 2263 (McNaughten rev. 1961)] formulations of the privilege as one limited to "the employment of legal process to extract from the person's own lips an admission of guilt. . . ." *Id.*, 763, n.7, 86 S.Ct. at 1832, n.7. But in the text, the Court cited the rule of "history and a long line of authorities in lower Courts" as extending the privilege to circumstances where the State sought to obtain evidence against an accused through "the cruel, simple expedient of compelling it from his own mouth. . . ." "In sum," the Court quoted from its almost concurrent opinion in *Miranda [Miranda v.*

*Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966)], "the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Id.* at 763, 86 S.Ct. at 1831.

Cases such as *United States v. Dionisio*, 410 U.S. 1, 7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973), "where the content of what is said is not at issue, but the physical aspects of the voice are at issue" (Objections, p. 4, l. 22 et seq.) are irrelevant to this case, where the subject was compelled, over his counsel's objection, to take the witness stand and answer questions about himself, his thought process, his knowledge, his past conduct, and his state of mind, not for *identification* but to reveal the very essence of the Government's case, i. e., that he was mentally deficient and dangerous.

The original recommendation was for denial of the petition, despite the violation of petitioner's Fifth Amendment privilege rights, on the ground that it was harmless error. Respondent, of course, while objecting to various findings and conclusions of the original Report which are contrary to the constitutional rules declared by the California Supreme Court [the federal courts are, of course, the final exposition of federal constitutional laws. *Sumner v. Mata*, 449 U.S. 764, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)], does not quarrel with the recommendation, which was (and remains) for denial of the petition.

Objections to the filed Report and Recommendation of the Magistrate were also filed by petitioner, principally attacking the conclusion that the error in compelling petitioner to testify was harmless beyond a reasonable doubt in that it did not contribute to the jury verdict because the other evidence, all unshaken and unrebutted, was so persuasive that it compelled the verdict that petitioner was retarded and dangerous.

Petitioner misconstrues *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 725 (1967) as to the application of the "harmless error" test. The Supreme Court expressly rejected the "*per se* reversible error" standard for general usage in the

case of even constitutional error; it noted the exceptions previously delineated [coerced confession, denial of right to counsel, impartial judge, *id.* at 23, n.8, 87 S.Ct. at 828, n.8], it reaffirmed the doctrine of *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) that "not all trial errors which violate the Constitution automatically call for reversal" (*Chapman*, at 23, 87 S.Ct. at 828). The test remains, "whether there is a reasonable doubt that the evidence complained of might have contributed to the conviction," *Fahy* at 86–87, 84 S.Ct. at 230, and the burden of demonstrating that the error complained of did not contribute to the verdict is upon the state. *Chapman*, at 24, 87 S.Ct. at 828.

It is sophistry to equate the compelled testimony with an involuntary confession, held to warrant reversal *per se* in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). His testimony was coerced; its content (while predictable) was not.

DATED: May 21, 1981.

/s/ Ralph J. Geffen
RALPH J. GEFFEN
United States Magistrate