Luther TYARS, Petitioner-Appellant,

v.

Dr. Richard FINNER, Medical Director of Patton State Hospital, Patton, California, Respondent-Appellee.

No. 81–5621.

United States Court of Appeals, Ninth Circuit.

Argued April 5, 1982.

Submitted April 8, 1983.

Decided June 21, 1983.

Andrew E. Rubin, Law Offices Barry Tarlow, Los Angeles, Cal., Littleton M. Gunn, Public Defender's Office, San Bernardino, Cal., for petitioner-appellant.

Jay M. Bloom, San Diego, Cal., for respondent-appellee.

Before WALLACE and NORRIS, Circuit Judges, and BURNS,* District Judge.

WALLACE, Circuit Judge:

Tyars appeals the district court's denial of his petition for a writ of habeas corpus. The district court held that Tyars was denied due process of law when compelled over objection to testify at his state involuntary commitment hearing, but concluded that the error was harmless beyond a reasonable doubt. We reverse and remand.

I

Tyars, a twenty-five-year old male, suffers from permanent mental retardation caused by a postnatal injury. His I.Q. has been measured at 48 to 57, well below the average range of 90 to 110, and his mental age has been estimated as equivalent to that of a five or six-year old. He is subject to seizures for which the anticonvulsant drugs Dilantin, phenobarbital and Mysoline, and the antipsychotic tranquilizer Thorazine, have been prescribed. He lacks rudimentary communication skills due to a physical speech impediment known as dysarthria, which affects the muscles controlling speech such that he is unable to enunciate words clearly. He has some difficulty performing such basic personal chores as brushing the teeth, showering and dressing.

Until 1965, Tyars resided with his family. For the next six years he lived in a "residential center" in Ontario, California, from which he was discharged when he turned fourteen, the maximum age. In January of 1971 Tyars was placed in the Patton State Hospital for the Developmentally Disabled in San Bernardino, California because of assaultive behavior against his family. The record does not reveal whether Tyars was committed to the hospital voluntarily or on the petition of his family or the State of California; nor does it demonstrate the nature of his assaultive behavior.

On April 12, 1976, the California district attorney for San Bernardino County commenced involuntary civil commitment proceedings against Tyars, filing a petition alleging that Tyars was a mentally retarded person and that he was a danger to himself and others. No mentally retarded person may be committed involuntarily in California unless he is "a danger to himself or others," Cal.Welf. & Inst.Code § 6500 (West Supp.1982), and all orders of commitment expire automatically after one year, subject to renewal by the same petition process for subsequent one-year periods. *Id.* The California trial court appointed a public defender to represent Tyars and set the matter for hearing pursuant to *id.* § 6503 (West 1972). Through his counsel, Tyars denied the State's allegation that he was dangerous to himself and others. The court granted Tyars' motion for a jury trial, directed that any verdict must be unanimous, and ruled that the State was required to prove the facts alleged in the petition beyond a reasonable doubt. At a preliminary hearing preceding the trial, Tyars' counsel moved the court to "respect" Tyars' privilege against self-incrimination under the fifth amendment and the due process clause of the fourteenth amendment, and to advise Tyars that any statements he made could be used against him. The motion was denied.

The case was tried in the state court on February 2 and 3, 1977. The State called a staff psychologist and a staff psychiatrist from Patton State Hospital. The psychologist testified that he had examined Tyars in December 1975 and November 1976, that in his opinion Tyars was mentally retarded and not psychotic, and that in his opinion Tyars was unable to manage his own affairs and required supervision for his own welfare. The psychiatrist, who had interviewed Tyars for one-half hour in May 1976, testified to the same effect. Both experts opined that Tyars was a danger to himself and others. The psychiatrist testified that hospital records showed Tyars had struck other patients, torn clothing and

---

* Honorable James M. Burns, Chief United States District Judge for the District of Oregon, sitting    by designation.

thrown articles in 1975 and 1976 and that he exhibited signs of anxiety, tension and hostility during his examinations. The psychologist testified that Tyars' ability to manage his own affairs had improved during 1976, but that no improvement in his aggressive behavior had been observed. He stated that Tyars' violence had continued up to the time of trial and was of such proportion as to require restraints and medication.[1]

The State also called a psychiatric technician from Patton State Hospital who often worked with Tyars. The technician was the State's chief witness on the question of Tyars' dangerousness, as he was the only hospital employee testifying who had personally observed Tyars within eight months of the trial and the only witness with first-hand knowledge of Tyars' violent behavior. The technician testified that Tyars had attacked other patients eight to ten times in the eight months preceding trial, that he had attacked the staff nearly as many times, and that it required from five to eleven staff members to subdue him.

Over the clear and continuing objection of his counsel, Tyars was then called as a witness by the State. He was bound in physical restraints throughout his testimony. He was also drugged with his "usual dosage" of 400 mg. of Thorazine. The customary oath was not administered because the court found that Tyars was incapable of understanding it. The court did, however, find that Tyars understood the importance of telling the truth and elicited a promise from Tyars that he would do so.

Due to his speech impediment, Tyars had considerable difficulty making himself understood. The court therefore had the staff psychiatric technician sworn as an "interpreter" in order to "translate English into English." The court's questions to Tyars were not restated by the interpreter, who on occasion would answer the questions himself without even purporting to give Tyars' answer. Moreover, Tyars' understandable words were not always the same as those repeated by the interpreter, who would "either summarize Tyars' answer or simply answer the court directly."[2] On at least five occasions Tyars insisted, through nods of his head or by saying "no," that the answers provided by the interpreter were incorrect. At one point, a spectator in the courtroom purported to "translate" one of Tyars' answers.[3] In this "interpreted" testimony, Tyars described several of his acts of violence, "illustrated his testimony by swinging his arms in descriptive punching motions,"[4] and "utter[ed] emphatic 'pows'" in a child-like effort to simulate the sound of his fists making contact."[5] All of this occurred in the presence of the jury with Tyars bound in restraints.

The jury deliberated for approximately forty minutes before returning a verdict finding Tyars a mentally retarded person who was a danger to himself and others. The court thereafter ordered his involun-

---

1. Tyars' daily dosage of Thorazine was increased to 300 mg., three times daily, in May 1976. Just prior to his trial the dosage was reduced to 400 mg., once per day. In addition, during his violent episodes in the hospital, Tyars was given sodium amytal, through injections. The hospital psychologist testified that Tyars had been placed in "soft-tie restraints," usually by tying him to a chair, on 19 occasions between April 1976 and January 1977. According to the psychologist, Tyars' "biggest problem [is that] he gets very upset if someone takes something from him . . . . [F]or instance, if somebody breaks one of his records that he likes—he likes music very much—then he becomes very upset. And some of the people that he's around, of course, are limited and might break something—and also disturbed. So that's a two-way problem."

Tyars' own testimony confirmed his strong attachment to his records. He stated that when another patient at the hospital broke one of his 45 records, he "Yeah, yeah, pow. Hit him, bust his head wide open." Tyars also stated that he was tied to chairs when people made him "mad."

2. *Cramer v. Tyars,* 23 Cal.3d 131, 136, 588 P.2d 793, 151 Cal.Rptr. 653 (1979).

3. *Tyars v. Finner,* 518 F.Supp. 502, 503 (C.D. Cal.1981).

4. *Cramer v. Tyars, supra,* 23 Cal.3d at 136, 588 P.2d 793, 151 Cal.Rptr. 653.

5. *Id.* at 143, 588 P.2d 793, 151 Cal.Rptr. 653 (Bird, C.J., dissenting).

tary commitment to Patton State Hospital for one year. Tyars appealed. His counsel argued that compelling Tyars to take the stand violated his privilege against self-incrimination under the fifth amendment and the due process clause of the fourteenth amendment. The California court of appeal agreed and reversed the jury verdict and judgment of commitment. *People v. Tyars,* 76 Cal.App.3d 1, 142 Cal.Rptr. 554 (1977), *superseded by Cramer v. Tyars,* 23 Cal.3d 131, 588 P.2d 793, 151 Cal.Rptr. 653 (1979). The California Supreme Court granted a hearing. By vote of 5 to 2, the Supreme Court affirmed the trial court, holding that the privilege against self-incrimination did not prohibit the state from compelling Tyars to testify. *Cramer v. Tyars, supra.*[6]

On May 31, 1979, Tyars filed the instant habeas petition in federal district court. The district court assigned the petition to a magistrate, who ordered a response to the petition, asked for the production of all state records, and directed briefing on certain additional questions.[7] For different reasons, both parties objected to the magistrate's recommendation. The district court adopted the recommendation in its entirety and denied Tyars' habeas petition on the ground that violation of the privilege was harmless beyond a reasonable doubt.[8] *Tyars v. Finner,* 518 F.Supp. 502 (C.D.Cal. 1981). This appeal followed. Our jurisdiction rests on 28 U.S.C. § 2253.

## II

We first examine the question of mootness. The district court concluded that "sound judicial administration" required it to entertain this habeas petition on the merits because the California Supreme

---

**6.** The majority reasoned that (1) the constitutional privilege against being compelled to testify in a criminal prosecution was inapplicable to civil commitment proceedings because "commitment may not reasonably be deemed punishment in either its design or purpose" and because of "[t]he predominately civil character" of the proceedings, *id.* 23 Cal.3d at 137, 588 P.2d 793, 151 Cal.Rptr. 653; (2) Tyars was improperly compelled to testify concerning any conduct which might "tend to implicate him in *criminal* activity," *id.* at 138, 588 P.2d 793, 151 Cal.Rptr. 653; (3) the questions relating to Tyars' mental condition did not violate this privilege because "such evidence may be analogized to the disclosure of physical as opposed to testimonial evidence," *id.* at 139, 588 P.2d 793, 151 Cal.Rptr. 653; and (4) the error involved in compelling Tyars to answer questions which might incriminate him in criminal matters was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), because the "overwhelming evidence ... of [Tyars'] repeated assaultive behavior established beyond question that he was a danger to himself and others." 23 Cal.3d at 139, 588 P.2d 793, 151 Cal.Rptr. 653.

**7.** The petition and its supporting memorandum argued that the privilege against self-incrimination is applicable to involuntary civil commitment hearings because the potential for deprivation of liberty makes such a proceeding a criminal case under the fifth amendment, and because the privilege is an element of the procedural due process required by the due process clause of the fourteenth amendment.

The State conceded that Tyars was entitled to federal habeas review because he had exhausted his state remedies. The State argued, however, that Tyars' claims were moot on the ground that he was no longer in state custody pursuant to the judgment of commitment challenged. The State maintained that the commitment order had expired pursuant to state law after one year but conceded that Tyars had been recommitted for an additional year in 1978 and that the State was "now seeking a new one year commitment against [him]." The State also argued that, notwithstanding the holding of the California Supreme Court (*see* note 6, *supra* ), the privilege against self-incrimination was totally inapplicable to this case because civil commitments are not criminal proceedings and because Tyars' responses were used only to establish his dangerousness, rather than to convict him for a criminal act. Finally, the State argued, on this issue in complete agreement with the California Supreme Court, that any error was harmless because "[i]ndependent of [Tyars'] testimony, it was clearly established [that Tyars] was mentally retarded and dangerous."

**8.** On April 23, 1981, the magistrate filed his report, recommending that the case was not moot, that the privilege against compelled testimony was applicable to civil commitment proceedings, and that Tyars' responses could not be considered physical exemplars unprotected under *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), but that the constitutional error was harmless beyond a reasonable doubt because of overwhelming, independent evidence of mental retardation and dangerousness.

Court's holding "could affect a large number" of California residents subject to involuntary commitment proceedings. 518 F.Supp. at 505. The district court also held that the one-year duration of the commitment order involved in this case made the constitutionality of the California Supreme Court's rule capable of repetition, yet evading review. The district court expressly found that because "Tyars has been subjected to repetition of the 1977 commitment proceeding each year, . . . [t]here is a definite likelihood that . . . Tyars will be subjected to future recommitment." *Id.* at 505–06. Relying on *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and *Doe v. Gallinot,* 486 F.Supp. 983 (C.D.Cal.1979), *aff'd,* 657 F.2d 1017 (9th Cir. 1981), the district court held that the controversy was not moot.

Although we do not accept all of the magistrate's reasoning as adopted by the district court, we agree that this case has not been mooted by the expiration of Tyars' 1977 one-year commitment. However, it is necessary to distinguish between the separate questions of mootness and jurisdiction. *See Martineau v. Perrin,* 601 F.2d 1201, 1204–05 (1st Cir.1979). The jurisdictional issue, not raised by the State, is a statutory question: whether the expiration of the challenged commitment order deprived the federal habeas court of its power to entertain the petition on account of the "in custody" requirement of 28 U.S.C. § 2254. The mootness issue is of constitutional dimension: whether the expiration of the commitment order moots what was initially a live, justiciable controversy, and whether there are any collateral consequences or a reasonable probability of repetition sufficient to demonstrate that the case remains justiciable. We have no difficulty on this record concluding that the jurisdictional prerequisite to habeas relief is satisfied and that the case is not moot.

■ The federal habeas corpus statute, 28 U.S.C. § 2254(a), limits the availability of the writ to those persons "in custody pursuant to the judgment of a State court . . . ." *See also id.* § 2241(c)(3). Both the statutory authority granted by Congress and the history of habeas corpus require that an applicant for federal habeas corpus relief be in custody at the time the petition is filed. *See Huante v. Craven,* 500 F.2d 1004, 1005–06 (9th Cir.1974) (per curiam); *Glazier v. Hackel,* 440 F.2d 592, 594 (9th Cir.1971). Although the scope of allegedly unconstitutional custody reviewable by way of habeas corpus "has been extended beyond that which the most literal reading of the statute might require," *Lehman v. Lycoming County Children's Services Agency,* —— U.S. ——, ——, 102 S.Ct. 3231, 3237, 73 L.Ed.2d 928 (1982), if the petitioner is in custody when his petition is filed, his subsequent release from custody does not itself deprive the federal habeas court of its statutory jurisdiction. *Id.* 102 S.Ct. at 3236; *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). The relief available under the statute is not limited to an order of discharge from state custody. *Id.* at 239, 88 S.Ct. at 1560; 28 U.S.C. § 2243 (habeas court may "dispose of the matter as law and justice require"). Thus, "once the federal jurisdiction has attached . . . it is not defeated by the release of the petitioner prior to completion of proceedings on such application." *Carafas v. La Vallee, supra,* 391 U.S. at 238, 88 S.Ct. at 1560. Because Tyars was in custody involuntarily at Patton State Hospital when his habeas corpus petition was filed, neither the expiration of the challenged commitment nor his apparent subsequent discharge from the hospital defeated the federal jurisdiction.

■ The question of mootness, involving considerations closely tied to the case or controversy requirement of article III, remains. Insofar as Tyars seeks release from state custody, his apparent discharge from the hospital moots the case to that extent. However, we have held that "it is not a bar to habeas corpus that a ruling favorable to the petitioner will not result in his release . . . . [H]abeas corpus is appropriate even though the petitioner does not seek, nor would a favorable decision grant, release from all 'custody.'" *Glazier v. Hackel, su-*

*pra,* 440 F.2d at 594–95, *citing Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). The question, therefore, is whether either the expiration of the 1977 commitment or Tyars' later discharge from Patton State Hospital, following at least two additional one-year commitments, moots this case for the purpose of any relief which might be granted.

We answered this legal question in the negative in *Doe v. Gallinot,* 657 F.2d 1017, 1021 n. 6 (9th Cir.1981), *aff'g,* 486 F.Supp. 983 (C.D.Cal.1979), in which we held that the appellant's discharge from involuntary confinement in a California mental hospital did not moot the controversy because (1) his subsequent involuntary commitments demonstrated "the likelihood that he [was] vulnerable to future commitment . . . under the . . . disputed terms," and (2) "[t]he actual time of confinement [was] too short to permit judicial review to conclude before discharge." The principles of *Doe* control here. That Tyars was committed involuntarily at least twice since his 1977 commitment, and that California law has validated the calling of Tyars as a witness in the 1977 proceeding establish the requisite " 'reasonable expectation' or . . . 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam), *quoting Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). The district court correctly found a definite likelihood that Tyars will be subject to future recommitment under the same procedures used in 1977.

In addition, it is not disputed that California law limits involuntary commitments under Cal.Welf. & Inst.Code § 6500 to one year. Direct review of Tyars' 1977 commitment by the California Supreme Court was not available until 1979. Thus, the tempo-

rary nature of the questioned commitment establishes that "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Murphy v. Hunt, supra,* 455 U.S. at 482, 102 S.Ct. at 1183. The "great majority" of civil commitments pursuant to section 6500 "do not last long enough for complete judicial review of the controversies they engender." *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 126, 94 S.Ct. 1694, 1700, 40 L.Ed.2d 1 (1974). Therefore, this case is not moot because the issues it raises are "capable of repetition, yet evading review." *Id.* at 122, 94 S.Ct. at 1698, *quoting Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

Because both elements of the "capable of repetition, yet evading review" exception to the mootness doctrine are met in this matter, the case is justiciable on that ground, and there is no occasion to explore alternative exceptions such as the collateral consequences rule of *Sibron v. New York, supra,* 392 U.S. at 57, 88 S.Ct. at 1899, and *Carafas v. LaVallee, supra,* 391 U.S. at 237, 88 S.Ct. at 1559. Nor need we decide whether the district court may ever rely on the alternative ground used to reject the suggestion of mootness based upon "sound judicial administration" and the potential that the legal principles of this case "could affect a large number" of third parties. *See Murphy v. Hunt, supra,* 455 U.S. at 482, 102 S.Ct. at 1183; *Warth v. Seldin,* 422 U.S. 490, 500–01, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975).

### III

As we turn to the merits, we observe that this case presents initially what has been described as "one of the most troublesome problems in judicial scrutiny of civil commitment procedures,"[9] an issue presenting "a hard choice between competing values."[10] Does the due process clause of the

---

**9.** Shuman, *The Road to Bedlam: Evidentiary Guideposts in Civil Commitment Proceedings,* 55 Notre Dame Law. 53, 73 (1979).

**10.** Note, *Civil Commitment of the Mentally Ill: Theories and Procedures,* 79 Harv.L.Rev. 1288, 1292–93 (1966).

   *See also* Morse, *A Preference for Liberty: The Case Against Involuntary Commitment of*

fourteenth amendment require that the fifth amendment privilege against self-incrimination, which in criminal cases prohibits compelling the accused to testify at his trial, be applied to state involuntary civil commitment proceedings? We conclude that this appeal does not require us to answer that question, at least not now. The solution to the issues presented to us should be met on a different level.

We discuss first the appropriate constitutional standard by which we measure the rights of a defendant in a civil commitment hearing. In doing so, we start by reviewing the analogous area of cases dealing with juvenile delinquency proceedings. Although they are civil in nature, juvenile delinquency proceedings have increasingly become subject to constitutional rules of procedure closely paralleling those required in criminal prosecutions.

In *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Court held that the privilege against self-incrimination, among other constitutional rights, applies to state juvenile proceedings:

> [T]he availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.... [J]uvenile proceedings to determine "delinquency," which may lead to commitment to a state institution, must be regarded as "criminal" for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the "civil" label-of-convenience which has been attached to juvenile proceedings.

*Id.* at 49–50, 87 S.Ct. at 1455–1456. The Court later applied *Gault* to require proof beyond a reasonable doubt in the adjudicatory phase of juvenile proceedings. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Court in *Winship* reaffirmed that the civil label of convenience is not sufficient to distinguish adult criminal trials from juvenile delinquency hearings. *Id.* at 365, 90 S.Ct. at 1073. Nor did the Court accept as determinative the fact that the purpose of juvenile delinquency hearings is not punishment: "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts." *Id.* at 365–66, 90 S.Ct. at 1073–1074.

It is significant that *Gault* and *Winship* do not turn on finding an analogy between criminal cases and juvenile proceedings and that *Gault* did not involve application of the fifth amendment privilege itself. *But see In re Gault, supra,* 387 U.S. at 61, 87 S.Ct. at 1461 (Black, J., concurring). Rather, both *Gault* and *Winship* rely upon an analysis of "the essentials of due process and fair treatment." *In re Gault, supra,* 387 U.S. at 30, 87 S.Ct. at 1445; *In re Winship, supra,* 397 U.S. at 359, 90 S.Ct. at 1070. Even the juvenile delinquency hearing need not conform, as a matter of federal constitutional law, to all the requirements of a criminal trial. *In re Gault, supra,* 387 U.S. at 30, 87 S.Ct. at 1445. This has increasingly become evident in the Court's more recent decisions. Although continuing to dismiss the civil/criminal distinction as a "wooden approach" that the Court "carefully has avoided," *McKeiver v. Pennsylvania,* 403 U.S. 528, 541, 91 S.Ct. 1976, 1984, 29 L.Ed.2d 647 (1971) (plurality opinion), the Court has expressly focused on the applicable due proc-

the Mentally Disordered, 70 Calif.L.Rev. 54 (1982); Comment, *Involuntary Civil Commitment: The Inadequacy of Existing Procedural and Substantive Restrictions,* 28 U.C.L.A.L. Rev. 906 (1981); Note, Cramer v. Tyars: *An Anomaly in California Civil Commitment Case Law,* 14 Loy.L.A.L.Rev. 165 (1980); Note, *Application of the Fifth Amendment Privilege Against Self-Incrimination to the Civil Commitment Proceeding,* 1973 Duke L.J. 729. *See generally* B. Ennis & R. Emery, *The Rights of*

Mental Patients 57–89 (1978); 1 Mental Health Law Project, *Legal Rights of Mentally Disabled Persons* 181–316 (1979); Aronson, *Should the Privilege Against Self-Incrimination Apply to Compelled Psychiatric Examinations?,* 26 Stan. L.Rev. 55 (1973); Note, Miranda *on the Couch: An Approach to Problems of Self-Incrimination, Right to Counsel, and* Miranda *Warnings in Pre-Trial Examinations of Criminal Defendants,* 11 Colum.J.L. & Soc.Prob. 403 (1975).

ess standard of fundamental fairness, *id.* at 543, 91 S.Ct. at 1985; *id.* at 553, 91 S.Ct. at 1990 (Brennan, J., concurring), balancing the liberty interest asserted by the juvenile against the potential for interfering with the state's benign purpose by application of a broad, quasi-criminal procedural rule. In *McKeiver,* for example, the Court held that the due process standards of *Gault* and *Winship* do not require jury trials in juvenile proceedings. And in a similar situation, the Court refused to extend *Gault's* right-to-counsel holding to summary courts-martial. *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976).

> It seems to us indisputably clear, therefore, that even in a civilian context the fact that a proceeding will result in loss of liberty does not *ipso facto* mean that the proceeding is a "criminal prosecution" for purposes of the Sixth Amendment
> . . . .
>
>   . . . .
>
>    . . . Whether [due process] embodies a right to counsel depends upon an analysis of the interests of the individual and those of the regime to which he is subject. *Wolff v. McDonnell,* 418 U.S. 539, 556 [94 S.Ct. 2963, 2974, 41 L.Ed.2d 935] (1974).

*Middendorf v. Henry, supra,* 425 U.S. at 37, 43, 96 S.Ct. at 1288, 1292.

Our reasoning, of course, is not limited to the Supreme Court's treatment of cases outside the context of civil commitment. The Court has applied this same due process approach, focusing on fundamental fairness, in its recent cases involving state civil commitments. Pointing to the "constitutional right to liberty," a right protected by the due process clause, the Court has held that a state "cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). The Court has not, however, applied the due process clause to civil commitments with the same rigor characteristic of its juvenile

delinquency cases following *Gault.* For example, in *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Court recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," *id.* at 425, 99 S.Ct. at 1809, but held that due process requires only "clear and convincing" proof for involuntary civil commitment, rather than the "proof beyond a reasonable doubt" required in juvenile proceedings under *Winship.* And in *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the Court expressly applied the procedural due process balancing approach articulated in *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976), and held that parent-instituted state civil commitment of minor children requires some kind of hearing before a "neutral factfinder," but that the hearing need not be a judicial or adversary proceeding.

Most recently, in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court considered the substantive due process rights of a mentally retarded individual during his involuntary commitment in a state institution. Again, the Court focused on the due process question of fundamental fairness, balancing "the liberty of the individual" and "the demands of an organized society." *Id.* 102 S.Ct. at 2460, *quoting Poe v. Ullman,* 367 U.S. 497, 522, 542, 81 S.Ct. 1752, 1765, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). Significantly, the Court reaffirmed the *Addington* and *Parham* approach to the *procedural* due process requirements for state civil commitment proceedings, stating that the Constitution requires a court to weigh "the liberty interest of the individual" against the state's "legitimate interests" in confinement, "including the fiscal and administrative burdens additional procedures would entail." 102 S.Ct. at 2461 & n. 28.

Based upon our reading of these Supreme Court precedents, we conclude that the wrong question has been asked of the California and federal courts. The fundamental inquiry does not begin with a deter-

mination of whether the fifth amendment protection against self-incrimination is transferable as such directly to an involuntary civil commitment procedure. Rather, we must focus upon fundamental fairness. We believe it is well-established that involuntary civil commitment is a deprivation of individual liberty which a state may not accomplish without complying with the essentials of fair treatment and due process in its substantive standard for commitment, the procedures used at the commitment hearing, and the conditions of such involuntary confinement.

█ The flexibility of the fundamental fairness requirement necessarily leads us to conclude that there need not be any automatic congruence between the procedural due process requirements in criminal trials, juvenile proceedings and involuntary civil commitments. The Court's holding in *Addington v. Texas, supra,* demonstrates as much. It is important to "measure the requirements of due process by reference both to the problems which confront the State and to the actual character of the procedural system which the State has created." *In re Gault, supra,* 387 U.S. at 68, 87 S.Ct. at 1465 (Harlan, J., concurring and dissenting). In weighing the liberty interest of the individual against the legitimate interests and purposes of the state in the civil commitment process, it is vital that, as a matter of constitutional due process, we impose those restrictions that are "imperative to assure the proceedings' fundamental fairness." However, we must also strive to "preserve, so far as possible, the essential elements of the State's purpose," and that we measure the requirements of due process with a sensitive awareness of the need to "permit the orderly selection of any additional protections which may ultimately prove necessary." *Id.* at 72, 87 S.Ct. at 1467.

We emphasize that this cautious approach to the constitutional aspects of involuntary civil commitment procedure is consistent with vigorous protection of the essential attributes of fundamental fairness and due process. In recent years we have heard appeals challenging state involuntary civil commitments on both substantive and procedural grounds. We have stated that "protecting the constitutional rights of the mentally retarded has become a concern of national importance, and ... the courts, when appropriate, can exercise their powers to protect those rights." *United States v. Mattson,* 600 F.2d 1295, 1297 (9th Cir.1979). In *Suzuki v. Yuen,* 617 F.2d 173 (9th Cir. 1980), we held that Hawaii's civil commitment scheme was unconstitutionally overbroad in that it permitted the involuntary commitment of persons who are mentally ill and "dangerous to property," *id.* at 176, and lacked any requirement of "imminent" dangerousness. *Id.* at 178. In *Doe v. Gallinot, supra,* 657 F.2d at 1025, we held that California's Lanterman-Petris-Short Act, which provides for emergency, involuntary commitment of persons "gravely disabled due to mental illness," violated the due process clause in the absence of any impartial pre or post-confinement hearing. In both *Suzuki* and *Doe,* however, we expressly focused on the due process clause, because a state may not involuntarily commit a person to a mental institution "without complying with minimum requirements of due process." *Id.* at 1021.

Having determined the appropriate constitutional standard, we turn to the merits of this case. The parties request us to decide whether the fifth amendment privilege against self-incrimination applies to state involuntary commitment proceedings. However, we have been taught that federal courts should "never ... anticipate a question of constitutional law in advance of the necessity of deciding it," and should "never ... formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960). *See Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 2451, 73 L.Ed.2d 16 (1982) ("[i]t is ... settled policy to avoid unnecessary decisions of constitutional issues"). As we observed earlier, the crucial constitutional question in this case is whether Tyars' 1977 commitment hearing complied with the essentials of fundamental

**1284**

fairness and due process. Because the Supreme Court precedents teach us to decide this appeal on a narrower ground, we do not reach the question of whether Tyars was unconstitutionally compelled to testify in violation of his privilege against self-incrimination.[11] The precise facts of this case do not require formulation of such a broad constitutional rule. *United States v. Raines, supra,* 362 U.S. at 21, 80 S.Ct. at 522. We therefore turn to the question of whether the procedure involved in this particular case comports with fundamental fairness and due process.

**IV**

■ Tyars was bound in restraints while in the presence of the jury. The record provided to us is barren of any demonstrable or articulable necessity for this. It requires no great extension of Supreme Court precedent to conclude that this may have violated his rights under the due process clause. In criminal prosecutions, both the due process clause and the confrontation clause of the sixth amendment require that "no person shall be tried while shackled and gagged except as a last resort." *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). Although exhibiting a defendant before the jury while physically restrained is not *per se* violative of due process, a trial judge may exercise his discretion to impose restraints only when "confronted with disruptive, contumacious, [and] stubbornly defiant defendants." *Id.* at 343, 90 S.Ct. at 1061. *See United States v. Ives,* 504 F.2d 935 (9th Cir.1974). The constitutionally permissible purpose for restraining such a contumacious defendant is "to maintain order in the courtroom and the integrity of the trial process in the face of an 'actual obstruction of justice.'" *Codispoti v. Pennsylvania,* 418

U.S. 506, 513, 94 S.Ct. 2687, 2692, 41 L.Ed.2d 912 (1974) (plurality opinion). Shackling, restraining or even removing a respondent from the courtroom must be limited to cases urgently demanding that action, based upon a balancing of the defendant's rights to be present and to have an impartial jury with the need for orderly administration of justice. *See Scurr v. Moore,* 647 F.2d 854, 858 (8th Cir.1981); *United States v. Ives, supra,* 504 F.2d at 941.

■ The record does not demonstrate any disruptive or contumacious behavior by Tyars which even arguably could have justified his being restrained in the presence of the jury. Indeed, his medication was so strong that he slept soundly through the pretrial motions. Even if Tyars were disruptive, there is nothing in the record suggesting that a change in his dosage of medication, the use of family members or friends as a soothing influence, or any such less restrictive alternatives short of physical restraints were first considered by the trial court. Nor does the record demonstrate that Tyars was provided the opportunity to comport himself with the order and dignity required of a judicial proceeding or warned that disruptive behavior might result in physical restraints, or that a cautionary instruction was given to the jury. Nor does the record demonstrate that such lesser restraints would have been ineffective or impractical. Nonetheless, Tyars was exhibited to the jury in physical restraints when the express question it was to decide was whether he was dangerous to himself or others.

This, we conclude, gives rise to an even greater potential for juror bias than trying a criminal defendant in prison garb. "[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable

11. Judge Norris sees no point in avoiding the privilege against self-incrimination issue. The point is simply one of judicial restraint. We appreciate his concern for avoiding piecemeal litigation, and we have carefully considered that policy. But here it seems fairly probable that we can avoid a difficult constitutional issue of first impression by deciding the case on different grounds which find support in the

record before us. Under these circumstances, we deem it prudent to do so. While it is possible, depending on the district court's findings and rulings on remand, that we may need to address the privilege against self-incrimination issue on a second appeal, we prefer to await the district court's decision rather than prematurely, and perhaps unnecessarily, reaching the self-incrimination issue.

[restraints]" surely could have had a significant, deleterious effect on the jury's judgment. *Estelle v. Williams,* 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976). Although the criminal case precedents do not necessarily apply in a civil proceeding, we find them persuasive. The likelihood of prejudice inherent in exhibiting the subject of a civil commitment hearing to the jury while bound in physical restraints, when the critical question the jury must decide is whether the individual is dangerous to himself or others, is simply too great to be countenanced without at least some prior showing of necessity. In the absence of any such demonstrable or articulable necessity, and in the absence of any showing that less restrictive means not embodying the same potential for prejudice could have maintained order in the courtroom, the circumstances "deprive[d] the . . . proceeding of the appearance of evenhanded justice which is at the core of due process." *Mayberry v. Pennsylvania,* 400 U.S. 455, 469, 91 S.Ct. 499, 507, 27 L.Ed.2d 532 (1971) (Harlan, J., concurring). Reversal is therefore required.

In addition, we conclude that due process may have been violated in this case by the actions of the trial court in having the state's chief witness against Tyars, the staff psychiatric technician, sworn as an "interpreter" to translate "English into English." The facts demonstrate conclusively that the "interpreter" often answered the court's questions directly and frequently paraphrased Tyars' answers or substituted his own language for that used by Tyars. Although it is true that "proceedings involving the care and treatment of the mentally ill [or the mentally retarded] are not strictly adversary proceedings," *Lake v. Cameron,* 364 F.2d 657, 661 (D.C. Cir.1966) (en banc), states must respect the adversary nature of their own involuntary civil commitment proceedings to the extent necessary to provide the fundamental fairness required by due process. Here the state itself, in effect, assisted in corroborating the testimony of its witnesses by intermingling its own interests with the contrary interests of Tyars. The only witness with first-hand knowledge of Tyars' assaultive behavior served as a conduit through which Tyars' unintelligible or inarticulate answers were provided to the court and the jury.

We need not attribute any malicious motivation to the state to conclude that this conduct so seriously undermined the essential appearance of fairness as to deprive Tyars of his liberty without due process of law. We see no evidence here to validate a general criticism leveled by one legal and psychiatric expert that "court officers who attend or officiate such [civil commitment] hearings soon . . . become oblivious to the circus-like atmosphere." Slovenko, *Criminal Justice Procedures in Civil Commitment,* 24 Wayne L.Rev. 1, 33 (1977). On the contrary, as we read the record the trial judge appears to have conscientiously sought to protect Tyars' rights and to conduct an impartial hearing. However, the trial court was evidently not prepared for the extent of Tyars' speech impediment and did not foresee the unfortunate result of introducing "interpreted" testimony.

Based on the limited record before us, we reverse the district court's denial of Tyars' petition for a writ of habeas corpus. Reversal is not spared by the conclusion of the district court that the error found did not result in prejudice beyond a reasonable doubt. The error discussed was different from that upon which we decide. In addition, if on remand the district court once more is confronted with the issue, consideration should be given to what the standard of prejudice should be. It may be that the correct standard need not go as far as the "beyond a reasonable doubt" standard applicable to criminal constitutional questions due to the lesser burden of proof assumed by the state in involuntary civil commitment proceedings. *See Addington v. Texas, supra,* 441 U.S. at 425–33, 99 S.Ct. at 1808–1813.

Because the record is incomplete, we remand the case to the district court with instructions to determine whether the State has any justification, not appearing in the

record on appeal, to support the necessity of physically restraining Tyars in the presence of the jury. Of course, the district court should first review the record and, if appropriate, conduct an evidentiary hearing or order expansion of the record, to determine whether the pretrial motion made by Tyars' counsel on February 2, 1977, asking that Tyars be removed from the courtroom so that the jury would not see him in restraints, sufficed under California law to preserve the issue, whether counsel lodged any objection to use of the interpreter, whether either of these matters were pursued before trial, and whether any failure to object was excused by California law. If an appropriate objection was not made and was not excused under California law, the district court should decide whether habeas relief on these grounds is barred on account of a state procedural default under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). If a constitutional violation was properly preserved, the court will need to determine whether prejudice resulted to Tyars. Depending on his conclusion, the district judge should then either fashion an order granting any appropriate and necessary relief consistent with this opinion, or issue a certificate of probable cause for appeal, Fed.R.App.P. 22(b), at which time it may be appropriate for us to rule on the privilege against self-incrimination issue.

REVERSED AND REMANDED.

NORRIS, Circuit Judge, concurring in the result:

Although I applaud the majority for its seeming concern that civil commitment proceedings be conducted fairly, I find its method of handling this appeal so incongruous that I cannot join its opinion. First, the majority refuses to decide the question raised by Tyars in his habeas petition—whether the privilege against self-incrimination applies in civil commitment proceedings. Second, the majority proceeds to expound on the issue it refuses to reach, concluding in the abstract that the applicability of the privilege against self-incrimination in a civil commitment proceeding is to be judged by a flexible "fundamental fairness" test. Third, the majority then raises *sua sponte* a different constitutional question—whether physically restraining Tyars in the presence of the jury and using an interpreter to "translate" his testimony violated due process. Finally, the majority partially addresses the merits of the due process issue on a record the majority itself acknowledges is incomplete, and does so before knowing whether procedural defaults will preclude us from ever considering that issue as a basis for habeas relief. With that, the majority reverses the district court and remands with instructions to consider first, whether the state had any justification for restraining Tyars in the presence of the jury, and second, whether Tyars is barred from seeking habeas relief on the due process issue for failure to raise it in a timely manner in compliance with state procedural rules. All this strikes me as a strange way to run an appellate court.

Unlike the majority, I would decide the self-incrimination issue because it was presented *to and decided by* the California Supreme Court and is the sole basis for Tyars' petition for habeas relief. It was, understandably, the issue decided by the trial judge and the issue originally briefed and argued to this court.[1] I see no point in finessing decision of that issue in favor of a different constitutional issue raised *sua sponte* by the majority. If, however, we choose to ignore the self incrimination claim, it is all the more objectionable that the majority says we should do so in the

---

1. The only time the parties raised the due process issue was in response to our order of March 25, 1983, calling for supplemental briefs on the question "whether the state's placing of physical restraints on Tyars during the proceedings and use of a state witness as an interpreter to "translate" Tyars' testimony to the jury violat-

ed his constitutional right to due process." Predictably, the state raised what it termed an exhaustion problem—that Tyars had never raised a due process objection to the state court on appeal or to the district court on habeas. [Supplemental Brief for Appellee at 2–3] Tyars has yet to respond to that claim.

context of a sweeping discussion of standards of "fundamental fairness" that appears to be designed, *sub silentio,* to do two things: first, to reverse Judge Hauk's holding that Tyars was entitled to invoke the privilege against self incrimination in his civil commitment proceeding; and second, to make it both the law of this circuit and the law of this case that the availability of the privilege in civil commitment proceedings will be determined by a fundamental fairness test. This is all accomplished in dictum which is completely unnecessary to and is in fact in conflict with the majority's decision not to reach the self incrimination issue.

I would also refrain from commenting on the merits of the due process issue for several reasons. First, the Ninth Circuit has concluded, rightly I believe, that an appellate panel "may properly reach only the issues presented in [the appellant's] original [habeas] petition," *Powell v. Spalding,* 679 F.2d 163, 166 (9th Cir.1982). Second, it may be inappropriate for us to address a due process claim at any time since it appears that Tyars may be barred for procedural reasons from ever raising it on habeas.[2] To address the merits of the due process claim at this time, therefore, is to do violence to the principle that we should not "decide constitutional questions in advance of the necessity of doing so," *Kolender v. Lawson,* —— U.S. ——, —— n. 10, 103 S.Ct. 1855, 1860 n. 10, 75 L.Ed.2d 903 (1983). Finally, we simply do not have in the record before us the predicate facts necessary to make an informed and final decision on the due process question at this time. The record, as the majority itself recognizes, is "incomplete" on issues crucial to a determination whether physically restraining Tyars before the jury or using an interpreter during his commitment proceeding violated due process. To reach its result, therefore, the majority is forced to contort sensible appellate procedure: it asks the district court to make a finding on remand—whether the

state can demonstrate any justification for presenting Tyars to the jury under physical restraints—that should be an integral part of the opinion the majority has already rendered on the due process issue. Not only does that opinion seem to prevent the district court on remand from considering the due process issue as a unitary question, it also makes a shambles of the majority's professedly "efficient" approach to the case.

To my mind, then, the majority has undermined the very goals of judicial restraint and judicial economy it seeks to serve by its opinion, and has "resolved" Tyars' case in a piecemeal fashion that is by no means final. I cannot join an opinion that answers the wrong questions, skirts the right ones, and leaves open the distinct possibility that we will have to engage in this exercise all over again when, as seems likely, the case returns to us on the self-incrimination issue.

---

**2.** The state claims in its response to our request for supplemental briefing on the due process issue that Tyars failed to raise the due process issue either on appeal to the California Su-

preme Court or to the federal district court on habeas. As noted above, Tyars raised the due process issue before us only after we had, *sua sponte,* requested supplemental briefs on it.